**FILED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

AUG 31 2017 *dn*

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

|  |  |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, and WASHINGTON, and the COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, and the DISTRICT OF COLUMBIA, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| *ex rel.* [UNDER SEAL], | ) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) ) |
| [UNDER SEAL], | ) ) |
| Defendant. | ) ) ) |

Case No. _____

**FILED UNDER SEAL**
**PURSUANT TO**
**31 U.S.C. § 3730(B)(2)**

1:17-cv-06316
Judge Ruben Castillo
Magistrate Judge Daniel G. Martin

**COMPLAINT**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, and the STATES OF CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, and WASHINGTON, and the COMMONWEALTHS OF MASSACHUSETTS and VIRGINIA, and the DISTRICT OF COLUMBIA, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. _____ |
| *ex rel.* ELIZABETH A. ZELLNER, ) |  |
| Plaintiffs, ) |  |
| vs. ) |  |
| MEDLINE INDUSTRIES, INC., ) |  |
| Defendant. ) |  |

## COMPLAINT

Plaintiff Relator Elizabeth A. Zellner ("Relator" or "Zellner") files this Complaint against

Medline Industries, Inc. ("Medline" or "Defendant") pursuant to the *qui tam* provisions of the

False Claims Act, 31 U.S.C. §§ 3729-3733 and the analogous *qui tam* provisions in state false

claims laws (collectively, the "FCA"), and pursuant to the relevant provisions of the Illinois

Insurance Claims Fraud Prevention Act, 740 ILCS 92/15(a), and the California Insurance Fraud

Prevention Act, Cal. Insur. Code § 1871 *et seq.* (collectively, the "private insurance whistleblower

acts").  In support thereof, Zellner alleges as follows:

## I.     NATURE OF THE CASE

1.      Relator brings this action against Medline for causing hospitals, nursing homes and other healthcare providers ("Providers") to submit false statements and false claims to state and federal healthcare programs such as Medicare and Medicaid as well as numerous private insurers. During the period of 2011–2017, Medline provided millions of dollars in illegal kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) ("AKS"), thereby tainting and making false thousands of claims for payment and hundreds of certifications of compliance submitted to the government.  Causing false claims and false statements violates Sections 3729(a)(1)(A) and (1)(B) of the FCA, as well as analogous state false claims laws and the private insurance whistleblower laws, and makes Medline liable for harm to the federal and state governments..

2.      Medline sells medical and surgical supplies ("med-surg").  Relator was employed by Medline from October 2012 through September 2017.  She initially worked in its Finance department on transparency laws and transferred to the Compliance department in 2013.  Medline formed Compliance in connection with its 2011 settlement of a *qui tam* lawsuit filed by former Medline employee Sean Mason, who alleged widespread violations of the AKS by Medline from 2001-2007 (the "*Mason* action").  While the department was ostensibly created to ensure compliance with the law, in reality it was intended, and mainly operated, to serve as a "paper program" that instead ensured *non-compliance*. The primary function of "Compliance" was to greenlight kickback arrangements that corporate management deemed to be acceptable business risks.

3.      To unlawfully induce purchasing of its products from 2011–2017, Medline paid incentives to Providers, and to physicians and other clinicians who might order and/or recommend purchasing by Providers ("Clinicians"), in at least four ways:

2

(a) payments to Providers and Clinicians for research that was unnecessary, deficient or unreasonable (hereinafter sham "research payments"), for example grants and fees for specific projects;

(b) payments to Clinicians for other services that were unnecessary, deficient or unreasonable (hereinafter sham "consulting fees"), for example fees for poster presentations, advisory services or speaker fees;

(c) payments to Provider-affiliated charities that were improperly tied to that Provider's purchasing (hereinafter sham "donations"); and

(d) price reductions on items *not* paid for by federal and state governments in exchange for the purchase of items that *are* paid for by the governments, but without proper credit of the former to the governments as required (hereinafter "uncredited savings"), including free or reduced-prices on certain computer software and continuing education.

4.      Medline's first method paid millions of dollars in kickbacks to dozens of Providers and Clinicians through "grants" or other payments for "research."  In many instances, Medline's only purpose was to convey a purchasing inducement; the company freely accepted shoddy and incomplete work product no matter how poor.  Medline selected Providers and Clinicians almost exclusively for such projects.  Even when a given Medline grant generated meaningful results, at least one of its purposes was to induce purchases.  Medline's sham grants and improper research payments violated the AKS and caused Providers to submit false claims and statements to the government and private insurers.

5.      Medline's second method paid hundreds thousands of dollars in kickbacks to scores of Clinicians disguised as fees for "consulting" services, *e.g.* (a) "poster presentation fees" to display sham case studies at conferences, (b) "advisory fees" for unspecified or unnecessary services, and (c) "speaker fees" to give oral presentations to fellow Clinicians.  Once again, Medline's payments fell far short of the foregoing regulatory standard for personal service fees. Rather, Medline used the Personal Services Safe Harbor to funnel payments to Clinicians to order or recommend Medline goods to their associated Providers.  As a matter of course, Medline

selected Providers and influential Clinicians almost exclusively for its projects, and accepted almost any level of performance no matter how deficient or incomplete. As noted above, "influential" meant "influence on Provider purchasing," not influence within a profession or field—Medline often "hired" Clinicians with no distinctive credentials. Medline's sham personal service fees violated the AKS and caused Providers to submit false claims and statements to the government and private insurers.

6. Medline's third method paid millions of dollars in kickbacks to hundreds of Providers disguised as "donations" to the Providers or their affiliated charities. One purpose of the "donations" was to curry favor and induce purchasing by those Providers. Medline often made donations as a reward for stable purchasing, as well as in conjunction with new or increased purchases. Medline's "donations" were channeled exclusively through its sales representatives; Medline's donations manager frequently consulted sales data in deciding whether, and how much, to "donate"; salespersons would routinely cancel pending donation requests where the Provider's purchasing circumstances had changed and a donation would have little impact on sales. Medline's "donations" to Provider-related entities violated the AKS and caused Providers to submit false claims and statements to the government and private insurers.

7. Medline's fourth method gave hundreds of thousands of dollars in savings on certain goods and services to hundreds of Providers to induce purchasing, more specifically to induce the Providers to accept "majority requirements" provisions in their contracts that obligated them to buy a large percentage of their supplies from Medline with respect to any goods it sold to government purchasers. For example, in exchange for such contracts Medline gave Providers free or reduced-price continuing education ("CE") related to its Skintegrity program; significant discounts on a software program called "abaqis"; and free or reduced-prices on a software program

called "Linenhelper." Medline's "uncredited savings" kickbacks on computer software for Providers violated the AKS and caused Providers to submit false claims and statements to the government.

8.     As a result of the *Mason* settlement, if from no other source, Medline was aware that billions of dollars in goods that it sold to Providers were in turn billed to, and paid for by, federal health care programs such as Medicare and Medicaid as well as numerous private insurers. Also as a result of the *Mason* settlement, if from no other source, Medline knew that its sham research payments, consulting fees, donations and uncredited savings would taint and make false all claims for payment submitted by Providers in connection with unlawfully-induced purchases. As such, Medline is liable under the FCA, analogous state false claims laws and private insurance whistleblower laws for knowingly causing Providers to submit false statements and false claims for payment to the United States, the Plaintiff States and the private insurance market.

## II.     JURISDICTION AND VENUE

9.     Relator brings this action on behalf of the United States of America and the Plaintiff States for violations of the FCA, 31 U.S.C. §§ 3729-3733, and analogous state false claims laws.

10.     This Court has subject matter jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 3732(a), which confer jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

11.     This Court has subject matter jurisdiction over the state law claims and private insurance whistleblower law claims alleged herein pursuant to 31 U.S.C. § 3732(b). In addition, this Court has supplemental jurisdiction over the claims brought on behalf of the Plaintiff States and private insurance whistleblower law claims pursuant to 28 U.S.C. § 1367.

12. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because they are found, transact business, and committed acts prohibited by 31 U.S.C. § 3729 in this District.

13. Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants are found, transact business, and committed acts prohibited by 31 U.S.C. § 3729 in this District.

14. This suit is not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation; in a Government Accountability Office or Auditor General's report, hearing, audit, investigation; in news media; or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730 (e)(4)(A) and the parallel state false claims act and private insurance whistleblower laws.

15. To the extent that there has been a public disclosure unknown to Relator, she is an original source under 31 U.S.C. § 3730(e)(4) and the parallel state false claims act and private insurance whistleblower laws. Relator has direct knowledge of the information on which the allegations are based, and voluntarily provided this information to the federal government before filing this action based on that information under the foregoing authorities.

### III. PARTIES

16. Plaintiff-Relator Elizabeth A. Zellner was a Medline employee from October 2012 through September 2017. She is a resident of Illinois.

17. Relator brings this action on behalf of the United States of America pursuant to the *qui tam* provisions of the FCA, and the federal government is jointly a real party in interest to this action.

18. Relator also brings this action on behalf of several individual States pursuant to the *qui tam* provisions of their respective false claims act and whistleblower statutes (the "Plaintiff States and Localities"). The Plaintiff States and Localities include the states of California,

Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Michigan, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, and Washington, the Commonwealths of Massachusetts and Virginia, and the District of Columbia. Relator brings this action under the *qui tam* provisions of the following false claims laws of the Plaintiff States and Localities: California False Claims Act, Cal. Gov. Code § 12650 *et seq.*; Colorado Medicaid False Claims Act, Col. Rev. Stat., §§ 25.5-4-303.5 through 25.5-4-310; Connecticut False Claims Act, Conn. Gen. Stat. §§ 4-274 through 4-289; Delaware False Claims and Reporting Act, 6 Del, C. § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. Ann. §§ 68-081 through 68.092; Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.*; Hawaii False Claims Law, Haw. Rev. Stat. § 661-21 *et seq.*; Illinois Whistleblower Reward & Protection Act, 740 ILCS 175/l *et seq.*; Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5.-l *et seq.*; Iowa False Claims Act, Iowa Code Ann. § 685.1 *et seq.*; Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; Maryland False Health Claims Act, Md. Health-Gen. Code Ann. §§ 2-601 through 2-611; Massachusetts False Claims Law, Mass. Gen. Laws Ann. Ch. 12 §§ 5A through 5O; Michigan Medicaid False Claims Act, Mich. Code 400.601 *et seq.*; Minnesota False Claims Act, Minn. Stat. Ann. § 15C.01 *et seq.*; Montana False Claims Act, Mon. Code Ann. § l7-8-401 *et seq.*; Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Hampshire False Claims Act, N.H. Rev. Stat. § 167:61-b; the New Jersey False Claims Act, N.J. Stat. § 2A:32C-1 *et seq.*; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-l *et seq.*; New York False Claims Act, NY State Finance Law, Art. 13, § 187 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, 63 Okla. St. §

5053.1 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws § 9-l.1-l *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 through 71-5-185; Texas False Claims Act, Texas Human Resources Code, § 36.002 *et seq.*; Vermont False Claims Act, 32 Vt. Stat. Ann. § 630 *et seq.*; Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; Washington Medicaid Fraud False Claims Act, Rev. Code of Wa. Ann. 74.66.005 *et seq.*; and the District of Columbia False Claims Act, D.C. Code § 2-381.02 *et seq.*

19.     Relator also brings this action on behalf of the states of Illinois and California pursuant to the relevant provisions of the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/15(a), and the California Insurance Fraud Prevention Act, Cal. Insur. Code § 1871 *et seq.*

20.     Defendant Medline Industries, Inc. is a privately-held Illinois corporation.  Its principal place of business is in Northfield, Illinois ("Northfield offices").  Medline transacts business and committed acts proscribed by the FCA within this District.

## IV.     BACKGROUND FACTS

### A.     Medline's History of Kickbacks and Concealment

21.     Medline is the largest privately-held seller of medical and surgical supplies in the United States.  Its primary customers are healthcare systems, hospitals, surgery centers, hospices, SNFs, physician offices, and other healthcare providers.  The vast majority of those Providers participate in federal healthcare programs, including Medicare and Medicaid as well as in the private insurance market, and the medical and surgical supplies that they use for program enrollees are paid for by the state and federal governments and private insurers under various program-specific payment systems.

22.     The *Mason* action, noted above, alleged that Medline had "grown rapidly in recent years to $2.4 billion in annual sales" and that "the secret to Medline's explosive growth…is

payment of kickbacks."[1]  It also alleged that "Medline's primary sales strategy was to 'buy business' by offering various inducements to [hospitals and other healthcare providers] to encourage the purchase of Medline's products."[2]  Those kickbacks ultimately cost Medline $91 million—$85 million for the federal government and $6 million in attorneys' fees—but it was unclear whether Medline was a net winner or loser, given its profits on billions of dollars in new business during the relevant years.  "Having settled its claims against Medline for a large sum the government may have thought the company had learned its lesson and would cease providing bribes or kickbacks to nursing homes or any other of its customers." *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016).

23.     After the *Mason* settlement, Medline's explosive growth continued without interruption:  its total sales *tripled again to more than $9 billion* in 2016.  This uninterrupted growth was the result of uninterrupted kickbacks.  While Medline may have stopped certain overt forms revealed by the *Mason* action—cash bribes, free gifts, free entertainment, jobs for family members, rebates, "prebates," consignment payments, cash laundered through third parties, and overt "donations" from the sales department—it shifted to more camouflaged forms including those alleged herein—sham research payments, consulting fees and uncredited savings, and a new and more concealed version of "charitable donations" (as alleged fully below).  One of Medline's cleverest changes was a shift from paying kickbacks to top executives and purchasing department employees who *directly* controlled purchasing, as an operational matter, to the Clinicians who

---

[1] *See U.S. ex rel. Mason v. Medline*, Case No. 07 CV 5615 (N.D.Ill), Dkt. 1 (original Complaint), at ¶¶ 1, 6.

[2] *See Mason*, Dkt. 101 (Second Amended Complaint), at ¶6. *See also, Mason v. Medline*, 731 F.Supp.2d 730, 735-36 (N.D. Ill. 2010) (denying motion to dismiss SAC).

more subtly and *indirectly* controlled, influenced, arranged for and recommended purchasing as a strategic matter.

24.     The *Mason* and *Bogina* actions gave the Federal and state governments no reason to believe that Medline's illegal activities continued—or stopped and restarted—after the 2011 settlement. Indeed, the *Mason* settlement gave the government every reason to believe that the entire matter was resolved, and that Medline would not be paying illegal kickbacks to customers after March 2011. By the same token, Medline's filings under the Physician Payments Sunshine Act, 42 U.S.C. ¶ 1320a-7h, did not put the federal or state governments on notice of Medline's kickbacks. Under that statute, certain companies, including Medline, must disclose to CMS their payments to physicians and teaching hospitals. These payments are then made accessible to the public on www.openpaymentsdata.cms.gov ("Open Payments"). Reportable payments exclude those to medical professionals who are not physicians, and to entities that have not been specifically identified by CMS as teaching hospitals; for example, SNFs. Certain details of each individual payment are disclosed: for example, the payee name, date and amount. There is, however, far too little information to determine, based on the disclosed information, whether disclosed payments were kickbacks.

### B.      Relator's Knowledge of Kickbacks Paid by Medline

25.     The *Mason* action was unsealed and became known to Medline in 2009 and was settled in 2011; sometime during that period Medline created its first-ever Compliance department (formally "Office of Ethics and Compliance"). The department was ostensibly tasked with monitoring Medline's business operations to ensure that Medline would not relapse into the same sort of illegal conduct that formed the basis of the lawsuit—namely the days when "Medline's primary sales strategy was to 'buy business' by offering various inducements to Providers to

encourage the purchase of Medline's products."[3] However, Medline apparently never intended to change its business strategy as a result of the lawsuit, and secretly continued its unlawful activities, albeit in subtler or more camouflaged forms, after entering into the *Mason* settlement. Indeed, Relator came to view the Compliance department as not only hobbled by its superiors, but in fact as a tool used by the sales and marketing departments to paper over continued misconduct. So far as Relator could tell, the *Mason* action caused no meaningful change in Medline's business culture or strategy (or personnel, for that matter), despite certain changes in the forms of kickbacks used.

26. Relator started working for Medline in August 2012, and was initially a contract employee who did clerical work in the Finance department. In October 2012, Relator was formally hired and became a Compliance Auditor in Finance, working with the Compliance department on certain transparency reporting programs to state governments and planning for Medline's upcoming transparency report to CMS under the Sunshine Act. In 2013, Relator's position was relabeled Compliance Specialist and moved to Compliance, where she continued her transparency reporting activities and took on other general compliance duties such as training sales staff. In January 2015, Relator was promoted to Compliance Manager and assumed broader responsibility for the transparency program, and furthermore started new compliance duties that involved more "front-end" compliance issues. In mid-2016, Relator was promoted to Senior Compliance Manager and was assigned to spend one-half of her time on compliance issues arising from Medline's Dermal Management Systems ("DMS") Product Group, which had started to overwhelm Compliance with DMS's rapidly expanding scope of payments to Providers that implicated the AKS.

---

[3] *See Mason,* Dkt. 101 (Second Amended Complaint), at ¶6.

27.     During the period of 2012 through 2014, Relator formed the opinion that Medline's compliance efforts were weak compared to normal companies, and that its culture was—at best—not "compliance-friendly."  To her, Medline seemed "compliance-ignorant" and dismissive of regulations, but she generally worked on transactional transparency issues that involved raw data on payments.  Relator would therefore know, for instance, that certain payments had been made to certain Providers, and know of their basic characteristics such as dates and amounts.  While she generally had no additional facts or other indication that the payments were unlawful, Relator still had the impression that as a result of higher-level interference, Medline's compliance efforts were weak and under-resourced, both in terms of people and systems.

28.     Beginning in January 2015, Relator began working less strictly on raw data and increasingly on issues that involved the surrounding facts and circumstances of Medline's payments to Providers.  She also interacted more frequently with the commercial areas of the company, giving her some insight into the structure and intent of certain payment activities.  While some of this new information raised questions for her, Relator still believed that, in general, Medline's employees wanted to comply with rules and regulations, including the AKS, and that any failures were mere mistakes or misunderstandings rather than intentional and systematic violations.  However, this view slowly changed as Relator continued to witness those with authority and apparent "immunity" deliberately push into areas of questionable legality or ethics, and overrule and even retaliate against employees who opposed them.

29.     The turning point for Relator was an incident in October 2016 involving Debashish Chakravarthy, a high-level DMS employee, and the subsequent inaction of Medline.  Chakravarthy attempted to pressure Relator into not enforcing compliance policies, and in fact suggested she *help* him facilitate a kickback.  Relator was disturbed and wrote a memorandum to document the

conversation, providing copies to Medline's Legal and Human Resources departments. However, despite Chakravarthy's many previous transgressions, he was given only a slap on the wrist for a "meal violation," and was not disciplined for attempting to interfere with the compliance function. In fact, an employee of Human Resources relayed the sentiment that it had somehow been improper for Relator to document that and prior policy violations by Chakravarthy.

30.     Indeed, Relator came to see the Compliance department as not only a paper program, but in fact a tool used by Medline to camouflage its misconduct.  By maintaining a highly visible and apparently active Compliance department, Medline created the false impression that it was policing itself and preventing or rectifying any AKS violations or other misconduct.  For example, since 2013 Medline has widely distributed a 32-page "Code of Conduct" booklet with the motto "Integrity Above All" that includes seven full pages on compliance with the AKS and similar laws.[4]  In addition to providing a smokescreen by its mere existence, the Compliance department also furthered Medline's kickback schemes by actively weeding out the more overt violations, and scaling back others to make them less detectable or less offensive on their face.  So far as Relator knows, Medline's Compliance department has never self-reported any AKS violation to CMS or any other governmental authority, nor asked for written guidance of the sort frequently provided upon request by the Office of Inspector General of the Department of Health and Human Services ("OIG").  In short, Medline altered its tactics since the *Mason* settlement and offered Providers more nuanced inducements, but has not altered its overall strategy of "buying business" with kickbacks.

31.     For her part, once Medline's willful and systematic AKS violations became clear to her in late 2016 and early 2017, Relator did as much as she could to oppose all practices or

---

[4] https://www.medline.com/media/mkt/pdf/Code-Of-Conduct-MKT1320280.pdf

payments that she believed were improper or questionable. But each time, she was ignored by Medline officials, coached to view them less seriously, or offered assurances of corrective action that were, in fact, never taken. Furthermore, she witnessed Medline retaliate against employees that spoke out against the company's improper and illegal activities and feared retaliation herself. At bottom, Relator held a mid-level position and did not have authority to stop Medline's kickbacks. She also needed a job to support herself and personally could not afford to do more than what she did: try to impede Medline's kickbacks while she made plans to leave.

32. One common pattern throughout the 2013-2017 period of Relator's employment in Compliance was: (a) Relator would become aware of a suspicious payment or transaction involving Medline personnel and a Provider that could be intended as a kickback; (b) Relator would instruct the relevant sales or marketing personnel not to engage in that activity, or instruct them to reverse or otherwise rectify it; (c) those persons would object and appeal the issue to top management with authority over the Compliance department; (d) top management would balance Medline's sales interests against the risk and consequences of being caught; and (e) if the former was greater, management would instruct Compliance to drop the matter, and if the latter was greater, management would instruct sales or marketing to drop the matter (or, more often, instruct both parties to walk back the egregious characteristics of the transaction to reduce Medline's exposure to kickback allegations).

33. One of the earliest examples of the above involved advisory boards run by Marketing and later Sales. In December 2013, Relator and her supervisor had a meeting with Sue MacInnes, the then-Chief Marketing Officer of Medline. Relator recalls laughing out loud after Sue MacInnes explained that she planned to pay Providers' executives to attend an advisory board meeting where Medline would market itself. Relator thought the concept was a joke; when she

14

realized that it was not, she raised her objections regarding the legitimacy of the "advisory boards." Despite those objections, that advisory board and subsequent advisory boards took place, although with documentation that masked their true intent. When Relator raised further objections regarding the practice of paying the executives on the spot, she was overruled by the head of the Sales function, who noted that it would be "embarrassing" to ask the attendees for an invoice of services rendered.

34.     In her role in the Finance and Compliance departments, Relator had a special vantage point to observe first-hand the ways in which Medline was broadly, systematically, and knowingly violating the AKS, the FCA, and analogous state laws since at least 2012. Additionally, she became very familiar with the Medline departments and personnel who conducted the kickback activities.

**C.     Medline Personnel and Departments Involved in Kickbacks**

35.     In addition to Relator, who has direct and personal knowledge of all of the illegal inducement schemes described herein, Medline personnel known to Relator to have knowledge of one or more fraudulent schemes alleged herein include the following:

1. Debashish Chakravarthy, Ph.D., Vice President of Medline's Dermal Management Systems ("DMS") Product Division
2. Jonathan Primer, Group President of DMS
3. Brian Mattorano, Vice President of Strategic Marketing and Business Development for DMS
4. Emily Somers, Director of Marketing for DMS
5. Ann Ford, Esq., Chief of Ethics and Compliance Office
6. Kara Cassady, Associate Director Clinical Projects
7. Ed Drower, Research and Development
8. Alex Liberman, Esq., General Counsel
9. Lara Simmons, Division President for Quality and Regulatory
10. Laura Knudson, Donations Manager
11. Connie Tong-Morrison, Treasury Manager
12. Francesca Olivier, Corporate Social Responsibility Manager
13. Ron Barth, Executive Vice President of Sales
14. Dave Jacobs, Executive Vice President of Post-Acute Sales
15. Scott Sibigtroth, Senior Vice President of National Accounts

16.  Shawn Scott, Senior Vice President of Corporate Sales

36.     As reflected by this diverse list of employees, Medline's kickbacks were arranged, approved, and paid through several different divisions and departments and known to several others.  Because of their daily interaction with Providers and Clinicians, most of Medline's illegal payments were arranged and paid through its several marketing and sales departments.  Those departments were not centralized, but instead were dispersed throughout the company based on customer- and product-type.  Relevant to Relator's claims herein include the sales departments of Acute Care (hospital customers), Post-Acute customers (SNF, hospices and home health customers), and Advanced Wound Care (which has been recently incorporated into the Acute and Post-Acute sales forces), as well as the product marketing departments DMS (skin care, wound care and tissue regeneration products), Textiles (fabric products), Personal Care (incontinence products) and the many others that complete Medline's product offerings.

## V.     EFFECT OF KICKBACKS UNDER THE FCA

37.     The AKS, enacted as Section 1128B(b) of the Social Security Act, 42 U.S.C. § 1320a-7b(b), prohibits persons from offering, paying, soliciting, or receiving illegal remunerations "in return for . . . arranging for or recommending purchasing, leasing or ordering any good . . . or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(l)(B) and (2)(B).  The purpose of the AKS is to prevent Providers from acting in self-interest rather than solely considering patient necessity and federal and state government interests in making purchasing decisions; to preserve freedom of choice and competition among suppliers; and to prevent price inflation and overutilization of particular products or suppliers.  The AKS applies even if an effort to induce purchasing is only one of several purposes for the offer or payment.  The scope of the AKS is narrowed by certain statutory

16

exclusions and regulatory "safe harbors," and those alleged to have violated the statute bear the burden of proving their applicability. *See* 42 U.S.C. § 1320a-7b(b)(3); 42 C.F.R. 1001.952.

38. The two primary federal healthcare programs protected by the AKS are Medicare and Medicaid. Medicare is a federal health insurance program created by Congress in 1965 for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. It is the nation's largest health insurance program and covers nearly 40 million persons. Medicare is administered by a federal agency, namely the Centers for Medicare and Medicaid Services ("CMS"). Medicare pays doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *Id.* Medicaid was also created by Congress in 1965. *See* 42 U.S.C. §§ 1396-1396v. Medicaid is a public-assistance program that pays for medical expenses incurred by low-income patients. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") through CMS. *See* 42 U.S.C. §1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical goods and services according to government-established rates. *See* 42 U.S.C. §1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily determined percentage of "the total amount expended . . . as medical assistance under the State plan . . . " *See* 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as federal financial participation.

39. Complying with the AKS is a material condition of participating in federal and state healthcare programs and receiving and retaining payments thereunder; such programs will not pay for goods or services tainted by kickbacks. All Providers participating in the programs must submit annual written certifications of compliance with the AKS. For example, hospitals participating in Medicare and Medicaid submit annual Form 2552-10 "cost reports" to CMS containing statements

that all services billed to the program "were provided in compliance with [healthcare] laws and regulations," and that the goods and services billed for were not provided or procured through the "PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK" (emphasis in certification).[5]

40.     Any violation of the AKS taints and makes false all claims for payment submitted to the federal or state governments that are related to the kickback paid or offered.  42 U.S.C. § 1320a-7b(g).  Similarly, any violation of the AKS taints and makes false all certifications of compliance with the AKS submitted to the federal or state governments during the relevant period. Not only does knowingly *receiving* a kickback make a *Provider* liable under the FCA, but knowingly *paying* a kickback makes a *supplier* liable under the FCA because it thereby "caused" the receiving Provider's claims and statements to be false.  *See* 31 U.S.C. § 3729(a)(1)(A)

---

[5]MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED BY THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT.

CERTIFICATION BY OFFICER OR ADMINISTRATOR OR PROVIDER(S)

I HEREBY CERTIFY that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by . . . (Provider Name(s) and Number(s)) for the cost reporting period beginning . . . and ending . . . and that to the best of my knowledge and belief it is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.

("knowingly presenting, or *causing* to be presented, a false or fraudulent claim for payment or approval"); (B) ("knowingly making, using, or *causing* to be made or used, a false statement material to a false or fraudulent claim.")

41.     The California Insurance Fraud Prevention Act, *inter alia*, subjects any person who violates § 1871.7(a) thereof, or Sections 549, 550, or 551 of the California Penal Code, to civil penalties of between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim for compensation, as defined pursuant to a contract of insurance.

42.     The Illinois Insurance Claims Fraud Prevention Act, *inter alia*, subjects any person who violates any provision thereof, Section 17-8.5 or Section 17-10.5 of the Illinois Criminal Code of 1961 or the Illinois Criminal Code of 2012, or Article 46 of the Illinois Criminal Code of 1961 in addition to any other penalties that may be prescribed by law, to a civil penalty of not less than $5,000 nor more than $10,000, plus an assessment of not more than three times the amount of each claim for compensation under a contract of insurance.

## VI.     MEDLINE'S ILLEGAL KICKBACKS

### A.     Medline's Menu of Illegal Kickback Schemes Available to Customers

43.     Medline has knowingly and systematically violated the AKS, the FCA, and analogous state laws by providing illegal inducements to Providers and Clinicians in order to induce purchasing of products that it knew would be paid for by federal and state healthcare programs.  It has done so despite the fact that in 2011 it paid $85 million in the *Mason* settlement to settle claims that it had violated the FCA by paying bribes and kickbacks to Providers and their purchasing officials for the same purpose.  Medline has apparently not taken that substantial settlement as a cue to change its behavior, but rather as a cue to sophisticate and obfuscate its illegal tactics.

44.     In connection with settlement of the *Mason* action, Medline created the Compliance department. However, as Relator avers, that department is nothing but a sham created by Medline to provide cover for the fact that it continues to violate the same laws—albeit in somewhat subtler ways—that it paid for violating just six years ago. The theme that emerges when one considers all of Medline's current inducement schemes is that Medline has, instead of genuinely reforming its corporate culture, attempted to construct a façade of legitimacy and compliance to conceal the illegal business practices that it has tweaked and made more complex, but that it has been unwilling to abandon.

45.     Medline has, since the *Mason* settlement, engaged in the following illegal inducement schemes in order to stimulate sales of its products: (a) sham "research payments" to Providers and Clinicians for studies that had no reasonable purpose and generated no meaningful results; (b) sham "consulting fees" to Clinicians for personal services that were unnecessary, including "poster presentation fees," "advisory fees," and "speaker fees"; (c) sham "donations" to Providers or their affiliated charities that were improperly tied to that Provider's purchasing; and (d) "uncredited savings" on certain goods and services not billed to the federal and state governments, for example computer software and CE, in exchange for the purchase of goods to be paid for by the government, but without the value of those discounts being passed on to the government as required.

46.     All allegations herein regarding kickbacks and illegal inducements are based on conduct witnessed by Relator and/or communications Relator engaged in and/or witnessed by and among Medline personnel, supplemented by the results of her attorneys' investigation. Additional facts supporting the allegations herein are within Medline's exclusive custody and/or control, and/or those of third parties. Medline's kickbacks and illegal inducements are long-running,

widespread, and occur through numerous schemes. Unless otherwise specified, all kickbacks and illegal inducements alleged herein were paid by Medline within the relevant period. Unless otherwise specified or indicated by context, the origin and hub of all kickbacks and bribes was Medline's corporate headquarters, formerly in Mundelein, Illinois, and, as of 2016, in Northfield, Illinois.

      **B.    Sham "Grants" and Payments for "Research"**

      47.    Medline offered and paid kickbacks to several Providers and Clinicians in the form of "Discovery Grants" facilitated by Marketing and, once that program was discontinued, "research" payments, including "grants" facilitated by the commercial division DMS. Medline paid this money not to compensate Providers and Clinicians for legitimate, scientifically sound research, but to instead induce them to purchase, or arrange for or recommend the purchase of, Medline goods. These kickbacks violated the AKS, and caused Providers to submit to the government false claims for payment in violation of Section (a)(1)(A) of the FCA and analogous state law provisions, as well as false statements of compliance with the AKS in violation of Section (a)(1)(B) of the FCA and analogous state law provisions.

      48.    Medline freely accepted useless, deficient or suspicious research results in return for its payments, all of which were in fact organized and managed by Medline's <u>marketing</u> and <u>commercial</u> personnel with an intent to increase Medline sales. The true purpose of these payments was to induce Clinicians to arrange for or recommend to a Provider the purchase of Medline products, or as a kickback to reward Clinicians for previously securing large purchases of Medline's products (both pre-purchase and post-purchase payments may be kickbacks). Medline's sham "grants" and payments for "research" violated the AKS, and the associated Providers' claims for payment to government health care programs for the products that were purchased in relation to the illegal inducement payments violated the FCA and analogous state laws.

49. During the relevant period, namely 2012 through 2017, the Providers receiving Medline's sham "research" kickbacks, or whose Clinicians received such kickbacks, treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, the Providers submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by the Provider of its compliance with the AKS. Medline's kickbacks to the Providers and Clinicians tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by those Providers to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by those Providers to the government.

50. Medline knew, or reasonably should have known, that payment of kickbacks to the Providers and Clinicians would taint and make false all interim and cost report claims for payment submitted by those Providers to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. The providers' false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by the Providers to the federal government during the period affected by Medline's kickbacks to those Providers and Clinicians, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by those Providers.

### (a)     Unlawful "Research" Payments Through DMS

51.     The Medline product division, Dermal Management Systems ("DMS"), has been the most active in paying kickbacks under the guise of research payments, including "grants" in recent years, due both to its aggressive personnel and its product mix (skin care, wound care and recently tissue regeneration). Rather than setting forth a research strategy and budget for objective administration by a non-commercial function such as Medical Affairs, DMS personnel who are compensated based on sales select researchers directly based on ad hoc opportunities to grow business, with any subsequent research, no matter how shoddy, serving as an added bonus. Medline has channeled hundreds of thousands of dollars to Providers and Clinicians through DMS research payments, including those classified as "grants."  Not only has Medline achieved its primary purpose of paying to induce the purchase of Medline goods, but also its secondary purpose of obtaining biased, "cheerleading" research that assists Medline's marketing effort.

52.     Although Medline classifies much of this company-funded research as "investigator initiated" in order to push off regulatory burden and create a veneer or legitimacy, not one DMS research project or grant began as a researcher's proposal that was then subjected to an objective, non-commercial review committee with a selection process based on research needs. Rather, Medline's commercial organization identified business opportunities and then structured *quid pro quo* arrangements with the Clinicians whose favor Medline sought to curry. Even in cases where Medline engaged the Clinical Operations department to ostensibly monitor DMS research studies, the company viewed the Clinical Operations department as "subservient" to DMS and often ignored or rejected issues that Clinical Operations brought to its attention.

53.     Medline personnel directly promoting and operating the scheme included, but were not limited to, Jonathon Primer (Group President, DMS) and Debashish Chakravarthy (VP, DMS). The central responsibility and activity of both Primer and Chakravarthy was to conduct marketing

activities to increase Medline sales, and both were compensated accordingly. Top Medline executives authorized the scheme and shielded Primer and Chakravarthy from interference by Relator and other personnel in the Compliance department.

54. Primer has been brazen in his internal acknowledgment that the DMS payments are intended not to fund legitimate research, but rather to serve as an inducement for recipients to purchase DMS products. Specifically, on February 16, 2016, Relator and Primer had a meeting to discuss Primer's plans for DMS. At Primer's request, Relator's fellow employee O.S. also attended the meeting. Primer informed Relator that he wanted her to facilitate and approve several specific grant payments to individual Clinicians or their institutions, including Dr. Richard Simman and Dr. Paul Liu. In requesting Relator's approval, Primer explicitly stated that the grants were being directed at the intended recipients for "business reasons" and in the case of Dr. Simman, the purpose was to "keep [him] happy" by solving an immigration issue for one of Dr. Simman's fellows. Primer went on to state that Medline had already committed to the grant payments, despite that Relator, whose approval Primer was ostensibly seeking, was informed of this purpose for the first time at this meeting. Relator stated to Primer that it would be inappropriate to make grant payments in order to generate business, and Primer responded that all grants at all companies are in actuality intended to generate business. Although Relator removed herself from these requests, she understands that Medline awarded the sought-after despite the concerns she had voiced.

55. Medline's grants and other payments for sham "research" occurred throughout the entire period relevant to the claims pleaded herein, namely August 2011 through August 2017. The scheme was first developed in the aftermath of the *Mason* settlement as an alternative method of "buying business," as the company had stopped using certain other methods exposed by *Mason*, such as rebates, "prebates" and purported consignments. Medline orchestrated its sham research

payment scheme from its headquarters in Mundelein, Illinois (2011-2016), and Northfield, Illinois (2016-2017), and conducted the scheme nationwide and targeted Providers and Clinicians throughout the United States.

### a.    Unlawful "Discovery Grants"

56.    From 2011 to 2013, and even earlier, Medline engaged in a full-blown marketing campaign to disperse funds, in the form of grants, to Providers and Clinicians with the ability to purchase or influence the purchase of Medline products.  The program was administered by Medline's Marketing Department, and Medline went so far as to advertise the grant program to customers and prospective customers who attended Medline "customer visits" at its headquarters. In its invitations, Medline suggests that Providers and Clinicians visiting Medline for sales and marketing purposes "may be interested in our **Discovery** Grant program that funds research."

57.    The Discovery Grant program was rife with improper influence from the Marketing Department and other commercial functions in what was purportedly an initiative designed to enhance scientific and clinical research.  From at least 2011 to 2013, and on information and belief, by 2009, the program was overseen by Sue MacInnes, the then-Chief Marketing Officer at Medline, and it was Ms. MacInnes who executed the research grant contracts with recipients.  Ms. MacInnes' assistant in the Marketing Department, who was given the title of "grant coordinator," was responsible for making payments to grant recipients.  Although Medline established a panel to review and award grants, this panel primarily served to close the deal during the final stages of applicants' entry into these illegal arrangements.

58.    Medline's goal of inducing sales through its Discovery Grant program is further evinced by the fact that Medline intentionally targeted researchers that it viewed as being susceptible to the marketing pitch that was inextricably intertwined with its Discovery Grant

program. Medline aimed its pitch at clinicians with limited research experience and offered to guide them through the process by assigning a Medline "mentor" that would help develop the study to a state where it would receive funding. Some of the Medline "mentors" assigned to guide grant applicants and recipients included Debashish Chakravarthy, of DMS, and Alecia Cooper, of Marketing. The purpose of the assistance that Medline offered to these inexperienced researchers was to buy the researchers' loyalty and dependence on Medline in order to drive future sales.

59.     Medline has, through its Marketing Department, dispersed over $1.6 million in grant funding since 2009, some of which was paid to Providers who carried out no activity whatsoever. For example, in 2012, Medline approved a $100,000 grant to Montefiore Medical Center in New York, New York. On September 19, 2013, Medline made an initial payment of $20,000, but no work was ever conducted pursuant to the grant, and the purported lead researcher on the grant left the hospital in 2015. Similarly, Medline executed a $25,000 grant agreement with Holy Redeemer Health System in 2013, but no work was ever conducted despite the initial $8,250 payment made on October 30, 2013. Relator recently initiated an effort to recover grant funds for unperformed work, but the lack of any prior efforts shows that real results were just an afterthought for Discovery grants. The Discovery Grant payments were illegal inducements that were never intended to advance legitimate scientific or clinical research, but were rather intended to influence Providers' purchasing decisions in Medline's favor.

**b.     First Example of Sham "Research Payment"—Alvarez**

60.     One example of Medline paying kickbacks in the form of research payments involved Oscar Alvarez, Ph.D., who served as the director of the Center for Curative and Palliative Wound Care at Calvary Hospital in the Bronx, New York ("Calvary"), a large purchaser of med-surg supplies, from September 2004 until February 2017. During the period that he was director of the Calvary wound care program, Medline understood that Dr. Alvarez was in a position to

order, and/or recommend, the purchase of goods from Medline on behalf of Calvary. Alvarez was not a physician, but held a Ph.D. in Physiology, Nutrition and Biochemistry from Rutgers University, and a post-doctorate degree in Dermatology from a medical school.

61.     In October 2014, Medline entered into a "technical consultancy agreement" with Alvarez for the stated purposes of preparing and conducting a research study on the Medline product Hyalomatrix, as well as preparing and submitting a scientific manuscript on the "Support Surface Pressure Mapping Evaluation recently conducted at Calvary Hospital." Contrary to Medline's policy, the Alvarez agreement was not reviewed or approved by the Compliance department. Instead, it was prepared and executed by DMS with the knowledge and approval of Medline's top executives.

62.     From the period of January 2015 through September 2016, Medline made 21 monthly payments of $4,000 to Alvarez, such payments totaling $84,000. As a Compliance employee, Relator was involved in approving individual payments to Alvarez. Although the payments were suspect in many regards, *e.g.* invoices came in before the supposed services were rendered and payments were sent directly to Alvarez's home address, Relator approved them based on her understanding that Medline's General Counsel had authorized the arrangement and that Medline's Clinical Operations department was continuously monitoring his performance to ensure conformity with an approved protocol. Relator later came to learn that the DMS had instructed the original clinical project specialist assigned to the study, Alexandra Black, that "Oscar is going to have to be left pretty much alone to do his stuff" and that Ms. Black's replacement, Lori Rotolo, had not been able to schedule a site monitoring visit despite many attempts. (Ms. Black left Medline in early 2016 after voicing compliance concerns.)

63. While those payments were purportedly made for research, this was false and they were instead made to reward Alvarez for causing Calvary to purchase goods from Medline. The payments to Alvarez were a kickback in exchange for Calvary's purchase of approximately $220,000 in mattresses from Medline in July 2014, a purchase referenced by the "Support Surface Pressure Mapping Evaluation" in the contract. The engagement with Alvarez also corresponded to an increase in the volume of skin and wound care products purchased by Calvary from Medline. More specifically, Calvary's purchases were approximately $5,000 per month before November 2013, but increased threefold to approximately $15,000 per month thereafter. The total amount of Calvary's purchases from Medline in connection with kickbacks to Alvarez was approximately $800,000, and spanned the period of July 2014 through February 2017.

64. There is no indication that Alvarez ever prepared or submitted a scientific manuscript on the results of the "Support Surface Pressure Mapping Evaluation." As for the Hyalomatrix study, Alvarez's performance immediately and consistently fell far short of any reasonable standard for research, yet Medline continued to pay him $4,000 monthly. A protocol was not finalized until April 2015—four months after payments began. "IRB" approval was not obtained until July 2015—seven months after payments began. No patients were enrolled in the study until February 2016—thirteen months after payments began. In short, Alvarez was paid $52,000 even before he collected his first data point. Furthermore, Clinical Operations later informed Relator that there were discrepancies between Alvarez's supposed work and the ClinicalTrials.gov information on his study.

65. As various issues came to light, Relator attempted to mitigate or remedy them, initially by requiring a higher standard of documentation on invoices and later by deactivating the vendor number once the contract had expired, forcing Medline to confront the matter. Although

28

both Compliance and Clinical Operations preferred to break ties with Alvarez, DMS insisted on continuing the engagement. Primer and Chakravarthy earnestly defended and sought to extend the payments "because he is a 'friend' to Medline." Among other things, Primer falsely denied Relator's allegation in an October 19, 2016 meeting that the sham research fees were being sent directly to Alvarez. He also asserted in a January 4, 2017 meeting that the fees for the study were of fair market value, despite having no expertise in the area and being shown evidence from Clinical Operations to the contrary.

66.     In January, 2017, Alvarez was flown to San Diego to present the results of his "research" to the wound care sales force (a presentation that in fact drew objections from the sales force regarding his understanding Hyalomatrix). That evening, Alvarez met with DMS and Compliance department personnel, namely Primer, Chakravarthy, and Sissi Maio of DMS, along with Relator and her supervisor Ann Ford of Compliance. At this meeting, Alvarez and DMS admitted that Chakravarthy had designed the Alvarez agreement, not Medline's legal department, and that, among other things, Chakravarthy and Alvarez had falsely labeled it a "technical" rather than "research" consulting agreement to circumvent Calvary's research compliance requirements. Additionally, in this meeting, Ford advised DMS and Alvarez that any agreement going forward would need to be a bona fide fee-for-service research agreement, and that he would need to allow Clinical Operations to conduct a site monitoring visit for the Hyalomatrix study in the near future.

67.     Due to the compliance issues, Relator accompanied Lori Rotolo to a site monitoring visit at Dr. Alvarez's new facility, University Hospital in Newark, New Jersey on February 28th, 2017. This allowed seven additional weeks for Alvarez to assemble documentation for the study that he had been unable to produce to that point. However, at the site visit, Alvarez was unable to produce source patient data and admitted to discrepancies between his data set and an abstract for

his interim analysis. Furthermore, Alvarez produced an unsubstantiated budget reconciliation that showed a large amount of unexplained overhead, as well as rent for his own company, University Wound Care. Medline's payments to Alvarez were not reported to CMS or reflected in Open Payments because Alvarez was not a physician, and such payments were thus beyond the scope of the Sunshine Act.

68. During the period of time affected by Medline's kickbacks to Alvarez, namely January 2015 through September 2016, Calvary treated thousands of patients whose care, and med-surg supplies, were paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, Calvary submitted to the government certain interim claims for payment, and annual Form 2552-10 cost reports containing additional and/or reconciled claims for payment. The Form 2552-10 cost reports also included a certification by Calvary of its compliance with the AKS. Medline's kickbacks to Alvarez tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Calvary to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Calvary to the government.

69. Medline knew, or reasonably should have known, that payment of kickbacks to Alvarez would taint and make false all interim and cost report claims for payment submitted by Calvary to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Calvary's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Calvary to the federal government during

the period affected by Medline's kickbacks to Alvarez, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Calvary.

        c.      **Second Example of Sham Research Payment—Pineview Nursing and Rehabilitation Center**

70.      Medline executed a grant for $25,000 for Pineview Nursing and Rehabilitation Center ("Pineview") in March, 2013, and the full amount of the grant was paid out over three installments in 2013 and 2014. However, the purpose of the grant was not to contribute to any generalizable scientific or clinical knowledge, as evinced by the fact that the principal investigator was not research qualified and chose not to pursue publication of "study results." This is unsurprising given that the "grant" was not truly intended for research, but was rather a kickback in exchange for the purchase of Medline product. Documentation indicates that Medline's funds, rather than advancing scientific knowledge or clinical practice, were used to benefit Pineview exclusively, by providing nursing education and the purchase of a $20,000 of equipment. It is unclear what purpose, other than a *quid pro quo* arrangement, Medline would have in selecting a grant proposal where the objective was to reduce falls within a specific facility by 5% through education and equipment purchase. It is clear, however, that the principal investigator, Rebecca Cowan, RN, the Director of Nursing for Pineview, would be in a prime position to influence and recommend the purchase of Medline products.

71.      Medline experienced a marked increase in sales upon signing of the grant agreement. In 2010, Medline's annual sales were approximately $5,000; in 2011, approximately $4,000; and in 2012, approximately $12,000. However, once the contract was signed in January, 2013, sales increased to approximately $25,000 annually, then $65,000 in 2014, and again to $85,000 in 2015. Purchases tapered down to lower levels in 2016, perhaps because the quid pro

quo arrangement with Medline had been fulfilled. Medline's payments to Pineview were not reported to CMS or reflected in Open Payments because Pineview was not a teaching hospital, and such payments were thus beyond the scope of the Sunshine Act.

72.     During the period of time affected by Medline's kickbacks to Pineview, namely 2013 and 2013, Pineview treated thousands of patients whose care, and med-surg supplies, were paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare.    Throughout the relevant period, and in connection with those services, Pineview submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. Medline's kickbacks to Pineview tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Pineview to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Pineview to the government.

73.     Medline knew, or reasonably should have known, that payment of kickbacks to Pineview would taint and make false all interim and cost report claims for payment submitted by Pineview to the government during the affected period.  If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action.   Pineview's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Pineview to the federal government during the period affected by Medline's kickbacks to Pineview, including claims submitted under Medicare, Medicaid and TriCare.  If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Pineview.

### d. Third Example of Sham Research Payment—Visscher

74. In 2014, Medline paid $35,000 and $32,000 to the Cincinnati Children's Hospital Medical Center ("Cincinnati Children's") as final payments for two grants awarded to Marty Visscher, Ph.D., in 2009 and 2010, respectively. At the time of the grant applications and subsequent payments, Visscher was the director of the Skin Sciences Institute at the Cincinnati Children's and was in a position to influence and recommend the purchase of Medline products. Debashish Chakravarthy, as a member of the commercial function DMS, lobbied the Discovery Grant Committee vigorously for Visscher to receive grants on the basis that grants should be awarded to individuals who could influence the purchase of product. Medline awarded Visscher a first grant for $80,000, the agreement for which was executed in January 2010, and before that study was even completed, Medline awarded Visscher a second grant for $70,000, which executed in November, 2010.

75. After the grants had been awarded, DMS continued to exert inappropriate commercial influence over the research activities, with Chakravarthy serving as the point of contact and possible "mentor." Although it appears that research activities were carried under the grants, the primary purpose of issuing grant funds was to induce the purchase of product from Medline and the secondary purpose was to generate biased data, some of which could be used for off-label promotion regarding neonates. Visscher was reportedly terminated from her position at Cincinnati Children's due to "grant fraud" related these activities, among others.

76. During the relevant period of time affected by Medline's kickbacks to Visscher, namely 2014, Cincinnati Children's treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, Cincinnati Children's submitted to the government certain interim claims for payment, and annual

Form 2552-10 cost reports containing additional and/or reconciled claims for payment. The Form 2552-10 cost reports also included a certification by Cincinnati Children's of its compliance with the AKS. Medline's kickbacks to Visscher tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Cincinnati Children's to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Cincinnati Children's to the government.

77.     Medline knew, or reasonably should have known, that payment of kickbacks to Visscher would taint and make false all interim and cost report claims for payment submitted by Cincinnati Children's to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Cincinnati Children's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Cincinnati Children's to the federal government during the period affected by Medline's kickbacks to Visscher, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Cincinnati Children's.

## C.     Sham "Consulting Fee" Kickbacks

78.     Medline (particularly, but not exclusively DMS) also offered and paid kickbacks to several Clinicians in the form of consulting fees. Medline labeled these payments as "poster presentation fees," "advisory fees," and "speaker fees," and other ostensibly legitimate fees for services. However, Medline paid this money not to compensate Clinicians for legitimate personal services, but to instead induce them to arrange for or recommend to a Provider the purchase of

Medline goods. These kickbacks violated the AKS, and caused those Providers to submit to the government false claims for payment in violation of Section (a)(1)(A) of the FCA and analogous state law provisions, as well as false statements of compliance with the AKS in violation of Section (a)(1)(B) of the FCA and analogous state law provisions.

79.     As noted above, one of the safe harbors to the AKS is for personal services and management contracts. 42 C.F.R. § 1001.952(d). This safe harbor provision requires, among other things, that the aggregate compensation paid for the services be set in advance; that the term of the agreement be for at least one year; that the compensation in question be reasonable, based on fair market value, and determined through an arm's length negotiation; and that the arrangement serve a commercially reasonable business purpose. Furthermore, if the personal services agreement does not contemplate full-time services, it must, in order to fall within the safe harbor, specify the exact schedule of service intervals, the precise length of those intervals, and the exact amount of compensation for each interval. The personal services safe harbor does not cover any of the violations described herein.

80.     During the relevant period, namely 2012 through 2017, the Providers whose Clinicians received sham "consulting fee" kickbacks treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, the Providers submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by the Provider of its compliance with the AKS. Medline's kickbacks to the Clinicians tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by those

35

Providers to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by those Providers to the government.

81.    Medline knew, or reasonably should have known, that payment of kickbacks to the Clinicians would taint and make false all interim and cost report claims for payment submitted by the affiliated Providers to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. The Providers' false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by the Providers to the federal government during the period affected by Medline's kickbacks to their affiliated Clinicians, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by those Providers.

        (a)    **Medline's Inducements to Clinicians**

82.    Medline, through its sales and marketing personnel, is constantly monitoring the fields into which it sells products in order to identify Clinicians who could potentially recommend or influence the sales of its products to their associated Providers. Medline's primary concern is not with identifying Clinicians who have the appropriate qualifications to render legitimate services that meet predetermined business needs, but rather in identifying "in house" Clinicians who can opportunistically influence the sales of Medline products in an operational, transactional sense. Any genuine services that Medline receives or any use of a true "thought leader" in the field is a secondary benefit to generating sales.

83.    When Medline identifies a susceptible Clinician with purchasing influence, it considers the ways in which it might "hire" that individual. Medline then generates work that the

Clinician can ostensibly perform and subsequently pays "fees" for the services, no matter the quality. Medline essentially invents services that serve no commercially reasonable business purpose other than generating sales in a quid pro quo arrangement. In many cases, Medline would assign more than one type of service listed below to the Clinicians it paid.

84.     One of the most common forms of payments to Clinicians is for "poster presentations" that arise from clinical "case studies." Since 2011, DMS has paid hundreds of thousands of dollars to dozens of Clinicians for these sham services. As recently as August 3, 2017, Debashish Chakravarthy acknowledged in a conversation to a new Medline employee, MAH, that such case studies and poster presentations were quid pro quo arrangements designed to generate sales. In previous conversations with members of the Compliance department, Chakravarthy has acknowledged that one of his job duties was to increase sales by paying Clinicians to use Medline products.

85.     The bogus nature of the case studies/poster presentations is evinced in almost every aspect of its execution. Medline personnel who are compensated based on sales identify Clinicians who are willing to enter into such an arrangement and designate a product that they wish to sell or continue selling to the Clinician or their associated Provider. This product becomes the subject of the case series. At times, prior to the commencement of the case series, a DMS employee will write an abstract conveying the results of data that have not yet been collected, and may even submit that abstract to an upcoming conference. The Clinician then conducts the case series, sometimes with a sample size as small as one individual. When data points and photos have been obtained, sometimes without proper approvals or consents, DMS compiles the information and ghost writes the poster. Finally, Medline sends the Clinicians to conferences to present "their work" to other Clinicians, most often paying for travel and lodging in addition to fee for services.

86.     Another common form of payments to Clinicians is for "consulting" or "advisory" fees, through which Medline has also provided hundreds of thousands of dollars to dozens of Clinicians since 2011. Rather than developing a strategic business needs assessment and objectively seeking qualified Clinicians to pursuant to those needs, Medline sales and marketing personnel arrange paid engagements with Clinicians for unspecified services with little or no documentation of results. In fact, Medline views most documentation regarding services agreements with healthcare providers as a mere "formality" and has paid Clinicians without a contract a number of times, despite policies requiring Compliance pre-approval and a written contract to engage a healthcare provider.

87.     Relator repeatedly attempted to extract information regarding the legitimate business need for Clinician consultants, but has consistently been met with noncooperation. In a recent exchange, Relator asked DMS to provide additional information on a Clinician's proposal for "consulting and advising" services. After six weeks, DMS responded that the Clinician would be "coming in on Aug. 18th to Medline for all-day consulting with the Medline team on wound care—specifically on Hyalomatrix and PluroGel." Relator understood at this point that her involvement with this Clinician, like with many before, was simply a rubberstamp and that raising issues or failing to produce a contract would be met with dismissiveness at bet and hostility at worst. Relator cannot recall an instance where Compliance declined the use of a Clinician consultant despite various concerns.

88.     Medline also paid "speaker fees" to Clinicians, ostensibly for the purpose of compensating for performing speaking services on Medline products to other Clinicians. However, Medline did not maintain any official speakers' bureau that was based on a predetermined product strategy. Nor did Medline, as is industry standard, conduct speaker training or issue a regulatory-

approved slide deck. Instead, Medline used "speaker fees" as a means to induce the purchase of Medline product through Clinicians or their associated Providers.

89.     Some of Medline's speakers had no qualifications to recommend themselves other than the fact that they were users of Medline products and, until recently, it was commonplace for sales representatives in the speaker's territory to engage the speaker and thus create the opportunity to pay an influential customer. Furthermore, there were cases where it appeared that Medline was humoring the agenda of a Clinician, rather than a Clinician performing commercially reasonable services required by Medline. For example, Medline paid one Clinician, and even an attorney recommended by that Clinician, to speak on topic that she felt was important, but for which Medline could make no commercial claims.

90.     Although unable to rectify Medline's intent in providing consulting fees to induce the purchase of product, Relator worked to improve the process of contracting Clinicians, thus improving the outward appearance of the "consulting fees." For example, in 2016 Relator began working with a third-party, Salveo, that Brian Mattarono brought in upon arriving at Medline and realizing that DMS's Clinician contracting program was inappropriate. In early 2017, Relator drafted a new services agreement so that contracting would be "easier" and less likely to be passed over as it had in the past. Around that time, Relator also purchased rate cards so that Medline could assign objective fair market value rates for the first time.

### a.     Example of Sham "Consulting Fees"—Luttrell

91.     An example of Medline paying kickbacks in the form of personal service contracts, specifically "consulting fees" involves Dr. Tammy Luttrell, a Ph.D. of physical therapy who was previously employed by the University Medical Center of Southern Nevada ("UMCSN"). Medline has made over $35,000 in payments to Dr. Luttrell, such payments beginning in April 2014 and continuing to present day. These payments were given to induce and reward UMCSN purchases

that Luttrell directed or otherwise caused, including $257,845 worth of Medline's Hyalomatrix product over an approximately two year period. Those UMCSN Hyalomatrix purchases accounted for approximately 9% of Medline's total tissue regeneration sales to customers over that time period.

92.    Relator learned of the illegal nature of the payments to Luttrell when she was asked to approve certain travel expenses for Luttrell in late February 2016. Members of DMS, and Debashish Chakravarty in particular, told Relator that they needed approval for the travel expenses so that Luttrell could render peer-to-peer guidance to Dr. Timothy Pittinger, M.D., in applying Hyalomatrix to a patient. Chakravarthy and other DMS personnel informed Relator that they wanted to have the payments approved because Medline "owed" Luttrell, and implied that she had recently been terminated from her position at UMCSN because of the impropriety of the kickback arrangement she and Medline had in place. Relator and the Compliance Department initially refused to approve the request, citing the improper appearance of the situation, the fact that the peer-to-peer services were not in Luttrell's contract with Medline, the fact that appropriate credentialing and consents had not been arranged for, and the fact that it was bizarre and suspicious that a physical therapist would be counseling a medical doctor on the application of a tissue regeneration product.

93.    The commercial personnel in DMS did not take a "no" from the Compliance Department as a final answer. In particular, Jonathan Primer made it clear that the arrangement with Luttrell would continue unabated and that the peer-to-peer guidance would be rendered, regardless of whether the Compliance department approved it. The Compliance department relented in the face of a Medline executive who was insisting that an inducement arrangement continue after it had raised AKS concerns. The arrangement was ultimately allowed to proceed,

and Dr. Luttrell was paid $2,641.68 for her trip to provide peer-to-peer guidance to Dr. Pittinger. She was soon thereafter paid a further $2,555.41 for providing similar services with another medical doctor, Dr. Fred Mullins, at the Joseph M. Stills Research Foundation. The inducement payments to Dr. Luttrell were never reported to CMS under its Open Payment Program because Dr. Luttrell was not a physician and, therefore, payments made directly to her were not required to be reported under the program.

94.     Since the commencement of Medline's kickbacks arrangement with Luttrell in 2014, UMCSN treated thousands of patients whose care, and med-surg supplies, were paid for by government healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, UMCSN submitted to the government certain interim claims for payment, and annual Form 2552-10 cost reports containing additional and/or reconciled claims for payment. The Form 2552-10 cost reports also included a certification by UMCSN of its compliance with the AKS. Medline's kickbacks to Luttrell tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous provisions in state laws, thousands of interim and cost report claims for payment submitted by UMCSN to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous provisions in state laws, all statements of compliance with the AKS contained in cost reports submitted by UMCSN to the government.

95.     Medline knew, or reasonably should have known, that payment of kickbacks to Luttrell would taint and make false all interim and cost report claims for payment submitted by UMCSN to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Medline's false statements of compliance with the AKS were material to the government's decision to pay the interim and final

41

claims for payment submitted by UMCSN to the government during the period affected by Medline's kickbacks to Luttrell, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by UMCSN.

### b. Example of Sham "Consulting Fees"—Brindle

96. Another example of Medline paying kickbacks in the form of personal services contracts are payments to Christopher Tod Brindle, MSN, RN, who was employed at a Medline customer, the Virginia Commonwealth University Medical Center ("VCUMC"), throughout his engagement with Medline. From 2011 to 2015, Medline paid a total of $40,002.04 to Brindle, primarily for "speaking" services and "poster presentations." The most glaring indication that such services were an inducement are the egregiously high payment terms, which went well beyond fair market value for a Clinician of similar experience and expertise.

97. Medline's original engagement with Brindle called for him to present information on his own clinical usage of two Medline products, Marathon and Arglaes Powder. This agreement demonstrates that Brindle was not only in a position to order and recommend the purchase of Medline products to his own Provider, VCUMC, but also in a position to recommend the use and purchase of Medline products to Clinicians employed at other Providers.

98. Medline's original contract with Brindle, drafted circa June, 2011, stipulated flat payments of $700 per presentations of no more than an hour. Under these terms, Medline made a payment of $1400 for "(2) 15 min "in-booth" presentations" at a Wound Ostomy Continence Nurses Society meeting, among others. By comparison, Registered Nurses, even those with Masters Degrees, are typically paid between $100 and $200 an hour by the life sciences industry, with a small percentage of elite individuals earning as much as $300 an hour for their expertise. In the example listed above, Medline paid Brindle at a rate of approximately <u>$47 per minute</u>.

99.    Medline did not execute the original contract, or attempt to renew or replace it, after its would-be expiration. However, services continued beyond June, 2012, this time as a rate of $700 for 30 minutes of work. Although Medline later executed contracts at the insistence of Compliance, Medline's rates for Brindle continued to shift over time, always in Brindle's favor. The final rate, valid through 2016, appears to have been $750 for 30 minutes, $1,500 for 60 minutes, $3,000 for a full day, and $500 a day for travel.

100.    The division making payments, DMS, seemed intent on bypassing Compliance for approvals and thus forcing Compliance to rubber stamp payment terms that DMS had already agreed to for services that Brindle had already rendered. Payment records reveal a number of instances where the check requestor incorrectly marks a form that would route the payment to Compliance for approval, either by falsely noting that the payment does not require approval (as in April, 2013) or by checking the payment as approved by Compliance with a note that the "contract is on file" (as in December, 2014).

101.    Even as Medline made hefty payments to Brindle, it did not require detailed invoices as documentation of services rendered. For example, in the December 2014 payment listed above, Brindle simply listed that his fees were $4,000 for "time" and added expenses incurred. There was little, if any, indication that Brindle had actually presented a poster at a conference in England, and the business did not fully volunteer these facts when questioned by Compliance. Additionally, the business need for the poster, which was so general that it might be related to a number of wound care companies, was not established or documented by Medline.

102.    During the period of time affected by Medline's kickbacks to Brindle, namely 2011 through 2015, VCUMC treated thousands of patients whose care, and med-surg supplies, were paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and

Tricare. Throughout the relevant period, and in connection with those services, VCUMC submitted to the government certain interim claims for payment, and annual Form 2552-10 cost reports containing additional and/or reconciled claims for payment. The Form 2552-10 cost reports also included a certification by VCUMC of its compliance with the AKS. Medline's kickbacks to Brindle tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by VCUMC to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by VCUMC to the government.

103. Medline knew, or reasonably should have known, that payment of kickbacks to Brindle would taint and make false all interim and cost report claims for payment submitted by VCUMC to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. VCUMC's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by VCUMC to the federal government during the period affected by Medline's kickbacks to Brindle, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by VCUMC.

### c. Example of Sham "Consulting Fees"—Hollowell

104. Although DMS is the most active in paying "consulting fees" inducements to Clinicians, it not the only product division that attempts to induce the purchase of its product through such means. In April 2015, Compliance became aware that the Medline's Urology product division had engaged Dr. Courtney Hollowell, M.D., for consulting services at a higher rate than Compliance had initially approved. Relator furthermore came to learn that at the time of the

engagement, Medline was submitting a bid in response to an Request For Proposal from a Provider associated with Hollowell, namely the Cook County Health and Hospitals System ("Cook County HHS"), for the purchase of med-surg products that Hollowell was in a position to order or recommend on behalf of Cook County HHS.

105.     The Urology division submitted the original proposal for Hollowell's "consulting services," specifically presentations, webinars and new product development in October, 2014.  In response to that proposal, the Compliance department drafted a services agreement for Hollowell and provided it to the Urology division for execution. However, with no consultation between or notification to the Compliance department, the Urology division raised Hollowell's fee for service to $5,000 per quarter, contingent upon 4-6 hours of work. This generated an hourly rate of approximately $833 to $1,250, well above the mean fair market value hourly consulting rate for urologists. The Urology division also failed to disclose the presence of an RFP in the proposal for services.

106.     Between May 2015 and January 2017 Medline paid Hollowell $20,000 in four payments of $5,000 based on email invoices that varied widely in their service hours, though they consistently listed as well more than 4-6 hours of work. The first invoice, for approximately 17 hours of work and travel time, arrived only after Compliance had been made aware of the payment discrepancy and raised concerns regarding fair market value.

107.     During the period of time affected by Medline's kickbacks to Hollowell, namely 2015 through 2017, Cook County HHS treated thousands of patients whose care, and med-surg supplies, were paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare.  Throughout the relevant period, and in connection with those services, Cook County HHS submitted to the government certain interim claims for payment, and annual

Form 2552-10 cost reports containing additional and/or reconciled claims for payment. The Form 2552-10 cost reports also included a certification by Cook County HHS of its compliance with the AKS. Medline's kickbacks to Hollowell tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Cook County HHS to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Cook County HHS to the government.

108. Medline knew, or reasonably should have known, that payment of kickbacks to Hollowell would taint and make false all interim and cost report claims for payment submitted by Cook County HHS to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Cook County HHS's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Cook County HHS to the federal government during the period affected by Medline's kickbacks to Hollowell, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Cook County HHS.

**D.     Sham "Donations" Kickbacks**

109. Despite the fact that Medline paid $85 million in 2011 to settle allegations that it violated the AKS by, among other things, disguising illegal inducement payments to Providers as donations to charitable entities affiliated with those Providers, Medline has continued to make unlawful donations to Providers and their affiliates to attract, reward, and retain business. As with other aspects of Medline's efforts to induce sales with illegal payments, Medline has, with respect to its illegal donations scheme, attempted to hide the illegality of its behavior behind a veneer of

compliance efforts. Those "efforts" at compliance are, however, a sham, and despite the fact that Medline has tweaked certain details of its donations scheme since 2011, it still regularly and willfully makes "donations" that are, in fact, intended to attract, reward, or retain business.

110. Medline and its Foundation have made several thousand "donations" to Medline customers and charitable organizations affiliated with Medline customers, such as the foundations associated with hospitals. In 2014, 2015 and 2016 alone, Medline made approximately 2000 payments totaling over $5 million to Providers and their foundations. These "donations" were requested almost exclusively by Medline sales personnel and were intended not to serve charitable purposes, but rather to stimulate sales of Medline products. Such payments violate the AKS, thereby tainting and making false the express certifications of AKS compliance submitted by those customers in their annual cost reports.

111. Medline is structured to facilitate the illegal inducements in the form of "donations" to Providers to induce the purchase of Medline products. Unlike companies with legitimate charitable intent, Medline does not publicize a charitable giving strategy against which the public can apply, route donation requests through a committee or even offer matching for employee giving. This is because Medline's "donation" strategy is tied to sales.

112. Medline's "charitable donations" generally take the form of sponsoring a charity event, such as a hospital foundation's gala dinner or an SNF's golf tournament. In order to have his or her request for a donation approved, the requesting Medline sales representative is required to attend the event and is expected to invite as guests the purchasing personnel and or other influential employees of the customer that is benefitting from the event. Medline frequently invites spouses of their customers as well. Medline goes out of its way to avoid reporting these inappropriate invitations, and with the implementation of certain reporting requirements contained

47

in the Affordable Care Act, Medline began to prohibit employees from inviting physicians as guests to charitable events in order to avoid the requirement to report the entertainment to physicians.

113.    After the Mason settlement, Medline implemented new policies and procedures related to its "donation" scheme.  The new policies and procedures altered the details of how Medline operated its scheme, but they did nothing to reform the fundamental illegality of the "donation" scheme.  Medline continued to make donations to Providers or their affiliated charities in order to induce those customers to purchase Medline products.  This scheme continued with the new policies and procedures only altering details.

114.    From 2011 through 2015, Medline's policies and procedures dictated that one donation of up to $10,000 could be made annually to each Medline customer or their charity.  In 2016, Medline lowered the maximum amount to $5,000.  Although this reduction was an outcome of conversations with compliance regrading AKS risk, Relator's understanding is that it was put in place as a return on investment decision, given that the vast majority of "donations" were less than $5,000 and that the purchasing habits of customers whose charities received more than $5,000 annually would not be affected by a reduction in that amount.  Medline's cynical calculus in this regard was effectively the diametric opposite of an effort to comply with the AKS.

115.    As noted above, requests for "donations" came almost exclusively from Medline sales personnel.  While non-sales employees are theoretically able to submit requests, few, if any, do and such requests are denied unless they somehow serve as inducement to a customer to purchase Medline products.  Requests for donations are initiated by a Medline sales representative or by a Medline customer who channels the request through a Medline sales representative. Donation requests are not received from the public at-large because Medline does not publicly

solicit requests, and offers no online portal or other means by which such requests might bypass the sales department. Sales representatives are given the discretion to refrain from submitting requests if they do not believe that making the "donation" will stimulate sales of Medline products. Sales representatives frequently exercise this discretion.

116. Medline documents "donation" requests using two standard forms. Both of these forms have the primary – if not exclusive – purpose of creating a false veneer of compliance with the AKS. For example, the "Donation Request Form" filled out by the requesting Medline employee contains a purported certification of compliance with AKS principles.[6] The corresponding "Certification in Connection with Charitable Contribution Request" form is filled out by the prospective donee. It also contains a certification as to compliance with AKS principles. This documentation is consistent with Medline's efforts to *appear* to have changed its illegal business practices while continuing to engage unfettered in the same type of illegality that led to the Mason settlement.

117. After a sales representative submits a request for a "donation" it is reviewed by Medline's Donations Manager, Laura Knudson, or one of her designees. Ms. Knudson is responsible for implementing the policies and procedures related to donations, preparing periodic reports on aggregated and individual donations, and referring to more senior executives any new or unique issues that arise regarding donations. Laura Knudson and other Medline personnel responsible for reviewing "donation" requests deny requests that are too candid about the true sales-inducing purpose of the donation. Sales representatives are aware of this fact, and, in order

---

[6]The purported certification reads as follows: "By signing below, I [the Medline employee] acknowledge that the organization requesting this donation, and its affiliates, are not required or expected to purchase items or services from Medline as a condition of the donation or in exchange for the donation, and that no purpose of the donation is to induce or reward the purchase of items or services from Medline."

to facilitate approvals of their requests, they include minimal information in the documentation supporting the requests. Sales representatives openly discuss the sales implications of "donation" requests in private emails or in verbal communications with Ms. Knudson and with their sales managers. Those communication, however, are not recorded in any documentation of the "donation."

118. These private communications are far from the only evidence of Medline's consideration of business implications in its "donation" decision-making. Ms. Knudson has explicitly acknowledged that she screens and processes "donation" requests with business considerations in mind. Ms. Knudson, Relator, and Francesca Olivier, Medline's "Corporate Social Responsibility Manager," held a meeting in July 2017 in which they discussed the possibility of an online portal for donations. At that meeting, Ms. Knudson told Relator that when screening "donation" requests, she employs an "80/20 rule," whereby she ensures that 80% of "donations" serve the purpose of stimulating sales of Medline products and 20% of donations are true charitable contributions. That way, Ms. Knudson explained, Medline can justify its "donation" program by demonstrating that "not all" donations are solely intended to induce sales. The 20% of donations that are not sales related do not come from non-sales employees, but rather the executive office. Ms. Knudson further revealed at the meeting that she considers a customer's purchasing history with Medline when determining whether, and in what amount, to approve a "donation" to that customer or its affiliated charity, and that she even goes so far as to access customers' detailed purchasing histories to inform her decision.

119. Medline documents the "donations" to customers and their affiliated charities in a database. For the purposes of Open Payments reporting, spreadsheets from that database are provided to Medline's Open Payments team, of which Relator was a member. There were 24

spreadsheets for each year, corresponding to one per month for donations made by Medline and one per month for donations made by The Medline Foundation. Each spreadsheet consisted of several horizontal rows, one for each donation paid during the month, and several vertical columns, one for each category of information recorded by Medline. These fields include a "vendor number" assigned to the donation payee; a "customer number" assigned to the entity that purchases Medline goods; the person requesting the donation; the salesperson assigned to the customer; the check number of the payment; the names of customer personnel attending the charitable event; the contact information for the customer's purchasing personnel; and other information.

120.    At the July 2017 meeting, Ms. Knudson further revealed to Relator that Medline sales representatives contact her, primarily via phone, to have her deny their requested "donations" when the sales representative does not feel there is a business case make it the donation, *e.g.*, the sales representative is "on the outs" with the account. Ms. Knudson further explained that some of the more savvy sales representatives simply inform Ms. Knudson that they do not intend to attend the charitable event related to the "donation." This violates the "Charlie [Mills] rule" that sales representatives must have "skin in the game" and results in automatic rejection of the donation request.

121.    Perhaps not surprisingly, data indicates that Medline is an outlier in terms of the number of "donations" it provides and in terms of the amount of its "donations." Transparency data indicates that in both 2014 and 2015, Medline ranked first in the United States in terms of number of donations by an applicable manufacturer (broadly pharmaceutical, medical device and medical supply companies) to physicians or teaching hospitals, and ranked third in 2014 and fourth in 2015 in terms of overall dollars donated. These are vastly outsized donations when Medline's

size is compared to that of lower-ranking donors, including several Fortune 500 pharmaceutical companies and Fortune 500 medical supply competitors.

122.    In the second half of 2015, the Compliance Department brought the Open Payments data (indicating a disproportionately high number of donations made by Medline) to the attention of Medline's top-ranking executives and noted that the potential AKS violations were obvious. The executive office considered discontinuing the practice of sponsoring charitable events, and limiting "donations" to the purchase of tickets to such events.  Medline's sales personnel vigorously objected to any reduction in the volume of permissible "donations" because they feared that a reduction in donations to their customers would lead to a reduction in sales to those customers.  In particular, Dave Jacobs, the President of Medline's Post-Acute Care Division and Scott Sibigtroth, the Senior Vice President of National Accounts intervened and lobbied the executive office to allow for the continued provision of generous "donations" to induce sales to customers.  It was at this point that the executive office decided to reduce the maximum sponsorship from $10,000 to $5,000 for a year and then to implement ticket only donations the following year.

123.    In late 2016, the Compliance Department returned to the issue to prepare for the upcoming policy change to tickets only "donations".  However, Dave Jacobs and Scott Sibigtroth once again intervened and complained directly to Charlie Mills, who was persuaded to continue the donations program as to charities formally related to customers, but not to unrelated charities that might be preferred or designated by a customer's decision-makers.

124.    During the relevant period, namely 2012 through 2017, the Providers receiving Medline's "donation" kickbacks, or whose affiliated charities received such kickbacks, treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare

programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, the Providers submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by the Provider of its compliance with the AKS. Medline's kickbacks to the Providers and their affiliated charities tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by those Providers to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by those Providers to the government.

125.    Medline knew, or reasonably should have known, that payment of kickbacks to the Providers and their affiliated charities would taint and make false all interim and cost report claims for payment submitted by the affiliated Providers to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. The Providers' false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by the Providers to the federal government during the period affected by Medline's kickbacks to those Providers and their affiliated charities, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by those Providers.

### (a)    Example of "Donation" Inducement Payments—Lifetime Care Hospice

126.    One example of Medline making a "donation" to a customer's affiliated charity in order to induce purchases by the customer occurred on September 12, 2014. On that date, Medline

made a payment in the amount of $5,350 to Genesee Region Home Care Association, Inc. d/b/a Lifetime Care ("Lifetime Care Association"), a 501(c)(3) organization that was affiliated with Medline customer Lifetime Care Hospice ("Lifetime Care"). The payment to Lifetime Care Association was ostensibly made as a donation to support Lifetime Care's Second Annual Hospice Harvest Festival, which occurred on September 19, 2014. However, the payment was in fact intended to induce Lifetime Care to purchase Medline products, and to induce Lifetime Care Association to order and/or recommend such purchases. Medline kept track of the payment in a spreadsheet that contained other information, such as the customer that was affiliated with the payment's recipient (in this case, Lifetime Care), the Medline sales representative assigned to the customer's account (in this case, Rich Qualdieri), and the people attending the charity event at Medline's expense (in this case, eighteen people comprised of Medline sales representatives, Lifetime Care personnel, and their spouses).

127. During the period of time affected by Medline's kickbacks to Lifetime Care Association, namely 2014, Lifetime Care treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, Lifetime Care submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by Lifetime Care of its compliance with the AKS. Medline's kickbacks to Lifetime Care Association tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Lifetime Care to the government. The kickbacks also tainted and made false, in violation of

Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Lifetime Care to the government.

128.     Medline knew, or reasonably should have known, that payment of kickbacks to Lifetime Care Association would taint and make false all interim and cost report claims for payment submitted by Lifetime Care to the government during the affected period.  If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action.  Lifetime Care's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Lifetime Care to the federal government during the period affected by Medline's kickbacks to Lifetime Care Association, including claims submitted under Medicare, Medicaid and TriCare.    If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Lifetime Care.

**(b)     Example of "Donation" Inducement Payments—Inova Health System**

129.     Another example of Medline making a "donation" to a customer's affiliated charity in order to induce purchases by the customer occurred on October 9, 2015.  On that date, Medline made a payment in the amount of $10,000 to Inova Health System Foundation ("Inova Foundation"), a 501(c)(3) organization that was affiliated with Medline customer Inova Health System ("Inova").  The payment to the Inova Foundation was ostensibly made as a donation to support 2015 Inova Summit, which occurred on October 10 and 11, 2015.  However, the payment was in fact intended to reward previous purchases and induce Inova to continue purchasing Medline products, and to induce the Inova Foundation to order and/or recommend such purchases.  Medline kept track of the payment in a spreadsheet and in its ERP system ("SAP") that contained other information, such as the customer that was affiliated with the payment's recipient (in this

case, Inova), the Medline sales representative assigned to the customer's account (in this case, Andrew Hablitzel), and the people attending the charity event at Medline's expense (in this case, two Medline sales representatives and two Inova executives).

130.     During the period of time affected by Medline's kickbacks to the Inova Foundation, namely 2015, Inova treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, Inova submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by Inova of its compliance with the AKS. Medline's kickbacks to the Inova Foundation tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Inova to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Inova to the government.

131.     Medline knew, or reasonably should have known, that payment of kickbacks to the Inova Foundation would taint and make false all interim and cost report claims for payment submitted by Inova to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Inova's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Inova to the federal government during the period affected by Medline's kickbacks to the Inova Foundation, including claims submitted under

Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Inova.

### (c) Example of "Donation" Inducement Payments—Redlands Community Hospital

132. A third example of Medline making a "donation" to a customer's affiliated charity in order to induce purchases by the customer occurred on June 6, 2016. On that date, Medline made a payment in the amount of $5,000 to Redlands Community Hospital Foundation ("Redlands Foundation"), a 501(c)(3) organization that was affiliated with Medline customer Redlands Community Hospital ("Redlands"). The payment to the Redlands Foundation was ostensibly made as a donation to support the Redlands Foundation's 34th Annual Golf Classic, which occurred on June 16, 2016. However, the payment was in fact intended to induce Redlands to purchase Medline products. Medline kept track of the payment in a spreadsheet that contained other information, such as the customer that was affiliated with the payment's recipient (in this case, Redlands), the Medline sales representatives assigned to the customer's account (in this case, Michael Ogden and Larry Ontiveros), and the people attending the charity event at Medline's expense (in this case, four Medline sales representatives).

133. During the period of time affected by Medline's kickbacks to the Redlands Foundation, namely 2016, Redlands treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, Redlands submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by Redlands of its compliance with the AKS. Medline's kickbacks to the Redlands Foundation tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state

law provisions, thousands of interim and cost report claims for payment submitted by Redlands to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Redlands to the government.

134.    Medline knew, or reasonably should have known, that payment of kickbacks to the Redlands Foundation would taint and make false all interim and cost report claims for payment submitted by Redlands to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Redlands's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Redlands to the federal government during the period affected by Medline's kickbacks to the Redlands Foundation, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Redlands.

**E.      Uncredited Savings Kickbacks**

135.    Medline offered and paid kickbacks to several Providers in the form of price-reductions on certain goods and services that were not paid for by government healthcare programs to induce the purchase of goods that <u>were</u> paid for by such programs— and indeed included the <u>obligation</u> to make such purchases under "majority requirements" contracts. More specifically, Medline provided valuable continuing education ("CE") for free; reduced the price it charged for certain software called "Linenhelper"; and caused a related company, Providigm, to reduce the price it charged for certain software called "abaqis" for which Medline was the exclusive nationwide distributor. Medline knew that these price-reductions on goods and services <u>not</u> billed to government healthcare programs would not—and could not—be passed along to those programs as required to qualify for the "discount" safe harbor. Medline further knew, based on protests from

some Providers, that these type of arrangements fell afoul of the AKS. In addition to violating the AKS by paying such kickbacks, Medline also violated the AKS independently by systematically <u>offering</u> uncredited savings kickbacks during hundreds of "customer visits" to Medline's headquarters.

### (a)    Medline's Alternative "Uncredited Savings" Schemes

136.    One method of offering "uncredited savings" to Providers is the selling of "discounted programs" that require a Provider to purchase a majority percentage of certain products in order to receive valuable goods and/or services for free. For example, Medline markets a program called "Skintegrity," under which Providers can receive restricted CE education and outcomes management software if willing to purchase 75% of certain skin care products from Medline. Internally, Medline positions these programs as discounts on a bundle of goods and services that fit within the Discount Safe Harbor in order to camouflage the illegal nature of the inducement. Externally, however, Medline sales representatives market the inducement as something that accounts "qualify for" if they purchase, or continue purchasing, majority percentages of certain products, evincing the quid pro quo nature of the arrangement.

137.    By definition, the "discounted programs" could not fit within the Discount Safe Harbor. For example, in the case of Skintegrity, Medline does not independently sell the restricted CE education or outcomes management software at any rate, so it is not possible to bundle these items with products and then discount the bundle as a whole. In fact, Medline never placed a value on the restricted CE education or outcomes management software, and therefore it is impossible for the Providers to list the "discount" on their cost reports. Even if Medline had placed a value on such items, they are not reimbursed under the same methodology as Medline's med-surg supplies.

138.    Another, similar method of offering "uncredited savings" to Providers was the real-time "crediting" or "rebating" of pre-assigned software costs back to a Provider if the Provider

agreed to purchase a majority percentage of certain products. For example, Medline sold a software program called Linen Helper, for which Providers could receive a monthly "credit" or "rebate" on the monthly lease fee if willing to purchase 80% of their linens from Medline. Through means of this arrangement, Medline effectively provided customers with software free of charge in exchange for purchasing obligations. Additionally, Medline provided associated hardware, such as handheld tablets (e.g. iPads) and printers, to Providers at no cost in exchange for linen purchases. Relator is aware that approximately 500 Providers received Linen Helper free of charge based on minimum spends and that approximately 100 accounts have received hardware free of charge. In this case, Medline does assign a dollar value to the free items, however, they are also not reimbursed under the same methodology as Medline's linen supplies.

139.    One of the most celebrated "uncredited savings" programs that Medline offers involves a software program called "abaqis" that Medline markets to SNFs. The program helps SNFs collect and analyze data related to quality measures relevant to the SNFs. Medline is the exclusive distributor of abaqis, and has an equity interest in abaqis' owner, Providigm. Medline publicly discloses that it offers discounts of about 60% on subscription fees and about 45% on training and set-up fees to SNFs that are "Medline customers."

140.    What Medline does not disclose publicly is that merely being a Medline customer does not guarantee that a SNF will receive the generous discount on the abaqis software. In fact, if customers want to enjoy the discount on abaqis software, they must sign a written purchase contract with Medline that obligates them to buy a large percentage, normally 80%, of their med-surg supplies from Medline (a "majority requirements" contract). Thus, Medline induces customers to purchase increased amounts of Medline products by offering them a kickback in the form of the software discount.

141.    Although there is a statutory exception and regulatory safe harbor that, in some circumstances, insulate entities from liability for offering discounts on healthcare products, they do not apply to Medline's scheme to discount software in exchange for a guarantee of a certain amount in sales from the recipients of the price reductions. The statutory AKS discount safe harbor is codified at 42 U.S.C. § 1320a-7b(b)(3) and reads as follows: "[AKS liability] shall not apply to…a discount or other reduction in price obtained by a provider of services or other entity under a Federal health care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program."

142.    However, the statutory discount safe harbor does not apply to Medline's uncredited savings discounts because under the federal regulations governing the AKS, "discount" is defined as follows: "the term discount means a reduction in the amount a buyer (who buys either directly or through a wholesaler or a group purchasing organization) is charged for an item or service based on an arms-length transaction. The term discount does not include . . . Supplying one good or service without charge or at a reduced charge to induce the purchase of a different good or service, unless the goods and services are reimbursed by the same Federal health care program using the same methodology and the reduced charge is fully disclosed to the Federal health care program and accurately reflected where appropriate, and as appropriate, to the reimbursement methodology."

143.    Here, all of Medline's free or reduced pricing on goods and services not paid for by government healthcare programs are offered and provided to induce the purchase of its other goods that are paid for by such programs, and the Providers' resulting savings are not fully disclosed to the CMS, or reflected properly in the SNFs reimbursement methodology.

144.     Likewise, the regulatory AKS discount safe harbor, codified at 42 C.F.R. § 1001.952(h), does not apply to Medline's abaqis discounts.  The regulatory AKS discount safe harbor, like the statutory discount safe harbor, permits the provision of healthcare products at a discount when certain, strict requirements are met.  Like the statutory discount safe harbor, the regulatory discount safe harbor is not applicable to Medline's abaqis discount, because a discount is only eligible for protection under the regulatory safe harbor if, among other things, it is not linked to an agreement to buy a different good or service.  That being the case, Medline's scheme of tying abaqis discounts to agreements to purchase a certain amount of product from Medline is not eligible for protection under the regulatory discount safe harbor, and the scheme, therefore, constitutes a violation of the AKS.

145.     During the relevant period, namely 2012 through 2017, the Providers receiving Medline's uncredited savings kickbacks, or whose Clinicians received such kickbacks, treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare.  Throughout the relevant period, and in connection with those services, those Providers submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment.  The cost reports also included a certification by the Provider of its compliance with the AKS.  Medline's kickbacks to the Providers and Clinicians tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by those Providers to the government.  The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by those Providers to the government.

146.     Medline knew, or reasonably should have known, that payment of kickbacks to the Providers and Clinicians would taint and make false all interim and cost report claims for payment submitted by the affiliated Providers to the government during the affected period.  If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action.  The Providers' false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by the Providers to the federal government during the period affected by Medline's kickbacks to those Providers and affiliated Clinicians, including claims submitted under Medicare, Medicaid and TriCare.  If the government had known that the AKS certifications were false, it would not have paid the claims submitted by those Providers.

**F.     Customer Visits**

147.     One of the most common ways that Providers are marketed and offered these uncredited savings is through a "customer visit" to Medline headquarters.  Medline sales representatives identify Providers that exhibit the potential for sales growth and then invite their executives, purchasing personnel, influential clinicians and other decision makers to visit Medline's headquarters in order to "build the relationship." Very often, this includes the promotion of programs such as Skintegrity, Linen Helper and Abaqis, which promise free or reduced priced software in exchange for majority requirements contracts that call for the purchase of goods to be paid for by government healthcare programs.

148.     The Medline sales organization has determined that these visits are so effective at inducing purchase of Medline products that the "customer visit" program is currently factored into sales representatives' compensation plan.  Indeed, Andy Mills, the President of Medline, has stated "nothing can move a relationship forward faster than a customer visit to the Mundelein corporate headquarters… and I can promise you with 100% certainty that if you bring the right people to

visit us, your business will grow." In order to induce visits from the "right people," Medline currently pays for Providers' travel and lodging costs when they visit Medline's headquarters. In the past, Medline offered Providers tickets to sporting events and lavish meals.

149. Medline visits have been a part of company culture since Charlie and Andy Mills' fathers owned and controlled the business. The customer visit inducements have been a "sacred cow" that the Compliance Department has not been permitted to discontinue, despite AKS concerns from both external Providers and the internal Compliance department. Relator recalls at least a few instances where sales representatives asked her to write a memo explaining to their reluctant or refusing Provider that a customer visit was "legal." Not surprisingly, some Providers prohibit the visits or prefer to pay for their employees' travel expenses based on their analysis that such remuneration from Medline would implicate the AKS in its own right. Although Medline classifies the visits as "education," they are actually designed as an exercise in marketing and hospitality, as explained in internal communications that mention pampering and entertaining customers.

150. Between 2011 and 2016, there were approximately 200 customer visits per year, each one predicated on inducing the purchase of Medline products. Sales representatives submit a "Customer Visit Authorization Form" or a "Customer Introduction Letter" to request logistics for the trip, such as flights, hotels and executive dinners. In the past, representatives explicitly listed the value to be generated from each trip, but the current practice does not call for that value explicitly, nor is it always provided. Rather than discontinue the customer visit inducements, Medline currently plans to increase the number of customer visits it offers. It plans to do this in part to be able to impress customers with its new, luxury corporate headquarters in Northfield, Illinois.

151. During the relevant period, namely 2012 through 2017, the Providers offered Medline's kickbacks, or whose Clinicians were offered such kickbacks, treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, those Providers submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by the Provider of its compliance with the AKS. Medline's offers of kickbacks to the Providers and Clinicians tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by those Providers to the government. The offers of kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by those Providers to the government.

152. Medline knew, or reasonably should have known, that payment of kickbacks to the Providers and Clinicians would taint and make false all interim and cost report claims for payment submitted by the affiliated Providers to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. The Providers' false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by the Providers to the federal government during the period affected by Medline's kickbacks to those Providers and affiliated Clinicians, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by those Providers.

153. Medline knew, or reasonably should have known, that offering kickbacks to the Providers and Clinicians would taint and make false all interim and cost report claims for payment submitted by those Providers to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. The Providers' false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by the Providers to the federal government during the period affected by Medline's offers of kickbacks to those Providers and Clinicians, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by those Providers.

        (a)    **Example of Uncredited Savings in Conjunction with Customer Visit—Trilogy Health Services**

154. One SNF that received Medline's discounted rate on abaqis was Trilogy Health Services ("Trilogy"). On March 14 and 15 of 2016, Trilogy personnel visited Medline's headquarters to meet with Medline sales representatives for the explicit purpose of negotiating the sale of an increased amount of Medline products to Trilogy to enable Trilogy to continue to receive the discounted rate on abaqis. This blatantly inappropriate *quid pro quo* arrangement was recorded in a Medline sales representative's internal memorandum seeking approval for the customer visit. The Medline sales representative who drafted the memorandum was John Pritz, and the Medline Senior VP listed on the memorandum was Scott Sibigtroth.

155. In the memorandum, Pritz notes that he is seeking approval for a visit from several Trilogy purchasing officials. He writes in the memorandum that the "main objectives/opportunities" for the visit are to "1. Identify areas of growth to maintain abaqis preferred rate" and "2. Secure transition date of these products to Medline." Pritz goes on to state

even more clearly that Trilogy was receiving a discounted price on abaqis and that in exchange for that discount, Medline required Trilogy to purchase an increased amount of Medline products. He writes, "[Trilogy] currently has a preferred rate on the abaqis program. To maintain this rate they will need to increase their purchases of major categories of test strips, gloves, inco[7]." Medline's illegal inducement arrangement with Trilogy was not unique, but was rather an example of the company-wide policy to offer discounted pricing on abaqis to any Provider willing to enter into majority requirement contracts. Medline's discounts on abaqis to Trilogy were not safe harbor discounts.

156.    During the period of time affected by Medline's kickbacks to Trilogy, namely 2012 through 2017, Trilogy treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, Trilogy submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by Trilogy of its compliance with the AKS. Medline's kickbacks to Trilogy tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Trilogy to the government. The kickbacks also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Trilogy to the government.

157.    Medline knew, or reasonably should have known, that payment of kickbacks to Trilogy would taint and make false all interim and cost report claims for payment submitted by

---

[7]"Inco" is used as shorthand for "incontinence products" at Medline.

Trilogy to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Trilogy's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Trilogy to the federal government during the period affected by Medline's kickbacks to Trilogy, including claims submitted under Medicare, Medicaid and TriCare. If the government had known that the AKS certifications were false, it would not have paid the claims submitted by Trilogy.

        **(b)    Example of Uncredited Savings in Conjunction with Customer Visit—Intermountain Healthcare**

158.    One of the hospitals that received "credits" on its monthly Linen Helper fees was Intermountain Healthcare ("Intermountain"). From March 6 to March 8, 2012, Intermountain's Sourcing Manager Daniela Brinzei was hosted at Medline's headquarters in Mundelein, Illinois on a customer visit. Brinzei was responsible for sourcing Intermountain's large contract for linens, which Medline secured soon after, generating approximately $14 million dollars in linen sales over five years.

159.    Brinzei was hosted by Medline sales representative Mike Schwitzer, who noted in his memorandum requesting approval that Linen Helper was a "definite priority". Schwitzer wrote that the "business value expected from trip" was "2.2 mill" and noted that a previous customer visit from Intermountain "was very instrumental in overcoming some preconceived perceptions of Medline, and ultimately helped us gain the AWC contract." During Brinzei's visit, which Medline paid for, she was repeatedly offered reduced pricing for Linen Helper software for Intermountain in exchange for a majority requirements contract and resulting purchases to be paid for by government healthcare programs. Intermountain ultimately entered into such a contract. Medline's

arrangement with Brinzei and Intermountain was not unique. Medline paid for hundreds of customer visits per year as part of its sales strategy.

160. During the period of time affected by Medline's kickbacks and offers thereof to Brinzei and Intermountain, namely 2012 and later, Intermountain treated thousands of patients whose care, and med-surg supplies, was paid for by federal healthcare programs, including but not limited to Medicare, Medicaid and Tricare. Throughout the relevant period, and in connection with those services, Intermountain submitted to the government certain interim claims for payment, and annual cost reports containing additional and/or reconciled claims for payment. The cost reports also included a certification by Intermountain of its compliance with the AKS. Medline's kickbacks and offers to Intermountain and Brinzei tainted and made false, in violation of Section (a)(1)(A) the FCA and analogous state law provisions, thousands of interim and cost report claims for payment submitted by Intermountain to the government. The kickbacks and offers also tainted and made false, in violation of Section (a)(1)(B) the FCA and analogous state law provisions, all statements of compliance with the AKS contained in cost reports submitted by Intermountain to the government.

161. Medline knew, or reasonably should have known, that payment of kickbacks and offers to Intermountain and Brinzei would taint and make false all interim and cost report claims for payment submitted by Intermountain to the government during the affected period. If nothing else, this was made clear to Medline by judicial opinions written in the *Mason* action. Intermountain's false statements of compliance with the AKS, caused by Medline, were material to the government's decision to pay the interim and final claims for payment submitted by Intermountain to the federal government during the period affected by Medline's kickbacks to Intermountain, including claims submitted under Medicare, Medicaid and TriCare. If the

69

government had known that the AKS certifications were false, it would not have paid the claims submitted by Intermountain.

**COUNT ONE**
**FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A)**

162.  Relator realleges and incorporates by reference the allegations previously alleged herein.

163.  This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(A).

164.  As a result of the misconduct alleged herein, Defendant knowingly presented, or caused to be presented, to the United States government a false or fraudulent claim for payment or approval.

165.  The United States government, unaware of the false or fraudulent nature of these claims, paid such claims when they would not otherwise have been paid.

166.  By reason of these payments, the United States government has been damaged, and continues to be damaged, in a substantial amount.

**COUNT TWO**
**FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B)**

167.  Relator realleges and incorporates by reference the allegations previously alleged herein.

168.  This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 (a)(1)(B).

169.  As a result of the misconduct alleged herein, Defendant knowingly made, used, or caused to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the United States government.

170.    The United States government, unaware of the false or fraudulent nature of these claims, paid such claims when they would not otherwise have paid.

171.    By reason of these payments, the United States government has been damaged, and continues to be damaged, in a substantial amount.

## COUNT THREE
## CALIFORNIA FALSE CLAIMS LAW, CAL. GOV. CODE § 12650 *ET SEQ.*

172.    Relator realleges and incorporates by reference the allegations previously alleged herein.

173.    Based on the foregoing allegations, Defendant is liable under Cal. Gov. Code § 12650 *et seq.*

## COUNT FOUR
## COLORADO MEDICAID FALSE CLAIMS ACT,
## COL. REV. STAT. §§ 25.5-4-303.5 THROUGH 25.5-4-310

174.    Relator realleges and incorporates by reference the allegations previously alleged herein.

175.    Based on the foregoing allegations, Defendant is liable under Col. Rev. Stat., §§ 25.5-4-303.5 through 25.5-4-310.

## COUNT FIVE
## CONNECTICUT FALSE CLAIMS ACT, CONN. GEN. STAT. §§ 4-274 THROUGH 4-289

176.    Relator realleges and incorporates by reference the allegations previously alleged herein.

177.    Based on the foregoing allegations, Defendant is liable under Conn. Gen. Stat. §§ 4-274 through 4-289.

## COUNT SIX
## DELAWARE FALSE CLAIMS AND REPORTING ACT, 6 DEL., C. § 1201 *ET SEQ.*

178. Relator realleges and incorporates by reference the allegations previously alleged herein.

179. Based on the foregoing allegations, Defendant is liable under 6 Del, C. § 1201 *et seq.*

**COUNT SEVEN**
**FLORIDA FALSE CLAIMS ACT, FLA. STAT. ANN. §§ 68.081 THROUGH 68.092**

180. Relator realleges and incorporates by reference the allegations previously alleged herein.

181. Based on the foregoing allegations, Defendant is liable under Fla. Stat. Ann. §§ 68.081 through 68.092.

**COUNT EIGHT**
**GEORGIA STATE FALSE MEDICAID CLAIMS ACT,**
**GA. CODE. ANN. § 49-4-168 *ET SEQ.***

182. Relator realleges and incorporates by reference the allegations previously alleged herein.

183. Based on the foregoing allegations, Defendant is liable under Ga. Code Ann. § 49-4-168 *et seq.*

**COUNT NINE**
**HAWAII FALSE CLAIMS LAW, HAW. REV. STAT. § 661-21 *ET SEQ.***

184. Relator realleges and incorporates by reference the allegations previously alleged herein.

185. Based on the foregoing allegations, Defendant is liable under Haw. Rev. Stat. § 661-21 *et seq.*

**COUNT TEN**
**ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT,**
**740 ILCS 175/1 *ET SEQ.***

186. Relator realleges and incorporates by reference the allegations previously alleged herein.

187. Based on the foregoing allegations, Defendant is liable under 740 ILCS 175/1 *et seq*.

## COUNT ELEVEN
## INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION LAW, IND. CODE § 5-11-5.5.-1 *ET SEQ.*

188. Relator realleges and incorporates by reference the allegations previously alleged herein.

189. Based on the foregoing allegations, Defendant is liable under Ind. Code § 5-11-5.5.-l *et seq*.

## COUNT TWELVE
## IOWA FALSE CLAIMS ACT, IOWA CODE ANN. § 685.1 *ET SEQ.*

190. Relator realleges and incorporates by reference the allegations previously alleged herein.

191. Based on the foregoing allegations, Defendant is liable under Iowa Code Ann. § 685.1 *et seq*.

## COUNT THIRTEEN
## LOUISIANA MEDICAL ASSISTANCE PROGRAM INTEGRITY LAW, LA. R.S. 46:437.1, *ET SEQ.*

192. Relator realleges and incorporates by reference the allegations previously alleged herein.

193. Based on the foregoing allegations, Defendant is liable under La. R.S. 46:437.1 *et seq*.

## COUNT FOURTEEN
## MARYLAND FALSE HEALTH CLAIMS ACT, MD. HEALTH-GEN. CODE ANN. §§ 2-601 THROUGH 2-611

194.    Relator realleges and incorporates by reference the allegations previously alleged herein.

195.    Based on the foregoing allegations, Defendant is liable under Md. Health-Gen. Code Ann. §§ 2-601 through 2-611.

### COUNT FIFTEEN
### MASSACHUSETTS FALSE CLAIMS LAW,
### MASS. GEN. LAWS ANN. CH. 12 §§ 5A THROUGH 5O

196.    Relator realleges and incorporates by reference the allegations previously alleged herein.

197.    Based on the foregoing allegations, Defendant is liable under Mass. Gen. Laws Ann. Ch. 12 §§ 5A through 5O.

### COUNT SIXTEEN
### MICHIGAN MEDICAID FALSE CLAIMS ACT, MICH. CODE 400.601 *ET SEQ.*

198.    Relator realleges and incorporates by reference the allegations previously alleged herein.

199.    Based on the foregoing allegations, Defendant is liable under Mich. Code 400.601 *et seq*.

### COUNT SEVENTEEN
### MINNESOTA FALSE CLAIMS ACT, MINN. STAT. ANN. § 15C.01 *ET SEQ.*

200.    Relator realleges and incorporates by reference the allegations previously alleged herein.

201.    Based on the foregoing allegations, Defendant is liable under Minn. Stat. Ann. § 15C.01 *et seq*.

### COUNT EIGHTEEN
### MONTANA FALSE CLAIMS ACT, MON. CODE ANN. § 17-8-401 *ET SEQ.*

202.    Relator realleges and incorporates by reference the allegations previously alleged herein.

203.    Based on the foregoing allegations, Defendant is liable under Mon. Code Ann. § l7-8-401 *et seq.*

**COUNT NINETEEN**
**NEVADA SUBMISSION OF FALSE CLAIMS TO STATE OR LOCAL GOVERNMENT**
**ACT, NEV. REV. STAT. ANN. § 357.010 *ET SEQ.***

204.    Relator realleges and incorporates by reference the allegations previously alleged herein.

205.    Based on the foregoing allegations, Defendant is liable under Nev. Rev. Stat. Ann. § 357.010 *et seq.*

**COUNT TWENTY**
**NEW HAMPSHIRE FALSE CLAIMS ACT, N.H. REV. STAT. § 167:61-B *ET SEQ.***

206.    Relator realleges and incorporates by reference the allegations previously alleged herein.

207.    Based on the foregoing allegations, Defendant is liable under N.H. Rev. Stat. § 167:61-b *et seq.*

**COUNT TWENTY-ONE**
**NEW JERSEY FALSE CLAIMS ACT, N.J. STAT. § 2A:32C-1 *ET SEQ.***

208.    Relator realleges and incorporates by reference the allegations previously alleged herein.

209.    Based on the foregoing allegations, Defendant is liable under N.J. Stat. § 2A:32C-1 *et seq.*

**COUNT TWENTY-TWO**
**NEW MEXICO MEDICAID FALSE CLAIMS ACT,**
**N.M. STAT. ANN. § 27-14-1 *ET SEQ.***

210.    Relator realleges and incorporates by reference the allegations previously alleged herein.

211.    Based on the foregoing allegations, Defendant is liable under N.M. Stat. Ann. § 27-14-l *et seq.*

## COUNT TWENTY-THREE
## NEW YORK FALSE CLAIMS ACT, NY STATE FINANCE LAW, ART. 13 § 187 *ET SEQ.*

212.    Relator realleges and incorporates by reference the allegations previously alleged herein.

213.    Based on the foregoing allegations, Defendant is liable under NY State Finance Law, Art. 13, § 187 *et seq.*

## COUNT TWENTY-FOUR
## NORTH CAROLINA FALSE CLAIMS ACT, N.C. GEN. STAT. ANN. § 1-605 *ET SEQ.*

214.    Relator realleges and incorporates by reference the allegations previously alleged herein.

215.    Based on the foregoing allegations, Defendant is liable under N.C. Gen. Stat. Ann. § 1-605 *et seq.*

## COUNT TWENTY-FIVE
## OKLAHOMA MEDICAID FALSE CLAIMS ACT, 63 OKLA. ST. § 5053.1 *ET SEQ.*

216.    Relator realleges and incorporates by reference the allegations previously alleged herein.

217.    Based on the foregoing allegations, Defendant is liable under 63 Okla. St. § 5053.1 *et seq.*

## COUNT TWENTY-SIX
## RHODE ISLAND FALSE CLAIMS ACT, R.I. GEN. LAWS § 9-1.1-1 *ET SEQ.*

218. Relator realleges and incorporates by reference the allegations previously alleged herein.

219. Based on the foregoing allegations, Defendant is liable under R.I. Gen. Laws § 9-1.1-1 *et seq.*

## COUNT TWENTY-SEVEN
## TENNESSEE MEDICAID FALSE CLAIMS ACT,
## TENN. CODE ANN. §§ 71-5-181 THROUGH 71-5-185.

220. Relator realleges and incorporates by reference the allegations previously alleged herein.

221. Based on the foregoing allegations, Defendant is liable under Tenn. Code Ann. §§ 71-5-181 through 71-5-185.

## COUNT TWENTY-EIGHT
## TEXAS FALSE CLAIMS ACT, TEXAS HUMAN RESOURCES CODE § 36.001 *ET SEQ.*

222. Relator realleges and incorporates by reference the allegations previously alleged herein.

223. Based on the foregoing allegations, Defendant is liable under Texas Human Resources Code, § 36.002 *et seq.*

## COUNT TWENTY-NINE
## VERMONT FALSE CLAIMS ACT, 32 VT. STAT. ANN. § 630 *ET SEQ.*

224. Relator realleges and incorporates by reference the allegations previously alleged herein.

225. Based on the foregoing allegations, Defendant is liable under 32 Vt. Stat. Ann. § 630 *et seq.*

## COUNT THIRTY
## VIRGINIA FRAUD AGAINST TAXPAYERS ACT,
## VA. CODE ANN. § 8.01-216.1 *ET SEQ.*

226.    Relator realleges and incorporates by reference the allegations previously alleged herein.

227.    Based on the foregoing allegations, Defendant is liable under Va. Code Ann. § 8.01-216.1 *et seq.*

### COUNT THIRTY-ONE
### WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT,
### REV. CODE OF WA. ANN. 74.66.005 *ET SEQ.*

228.    Relator realleges and incorporates by reference the allegations previously alleged herein.

229.    Based on the foregoing allegations, Defendant is liable under Rev. Code of Wa. Ann. 74.66.005 *et seq.*

### COUNT THIRTY-TWO
### DISTRICT OF COLUMBIA FALSE CLAIMS ACT, D.C. CODE § 2-381.02 *ET SEQ.*

230.    Relator realleges and incorporates by reference the allegations previously alleged herein.

231.    Based on the foregoing allegations, Defendant is liable under D.C. Code § 2-381.02 *et seq.*

### COUNT THIRTY-THREE
### ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT,
### 740 ILCS 92/15(a)

232.    Relator realleges and incorporates by reference the allegations previously alleged herein.

233.    Based on the foregoing allegations, Defendant is liable under 740 ILCS 92/15(a).

### COUNT THIRTY-FOUR
### CALIFORNIA INSURANCE FRAUD PREVENTION ACT,
### CAL. INSUR. CODE § 1871 *ET SEQ.*

234.     Relator realleges and incorporates by reference the allegations previously alleged herein.

235.     Based on the foregoing allegations, Defendant is liable under Cal. Insur. Code § 1871 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Relator Elizabeth A. Zellner requests that judgment be entered against the Defendant, ordering that:

A.     The Defendant cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq.* and all analogous state false claims laws and private insurance whistleblower acts;

B.     The Defendants pay not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' actions, in addition to paying the maximum allowable statutory penalties, plus the maximum amount of damages allowable under analogous state false claims laws and private insurance whistleblower acts;

C.     Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d) and analogous provisions of state false claims laws;

D.     Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and analogous provisions of state false claims laws;

E.     The Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

F.     The Defendant disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

G.     The United States and Relator Elizabeth Zellner recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Elizabeth A. Zellner

hereby demands a trial by jury.

DATED:        August 31, 2017                      Respectfully submitted,

/s/ Jamie S. Franklin
Jamie S. Franklin

Ross B. Brooks
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas, 31st Floor
New York, NY 10019
646-402-5668
rbrooks@sanfordheisler.com

Andrew H. Miller
SANFORD HEISLER SHARP, LLP
1666 Connecticut Avenue NW, Suite 300
Washington, D.C. 20009
(202) 499-5212
amiller@sanfordheisler.com

Sherman Marek, ARDC No. 6201566
MAREK LAW OFFICE, P.C.
825 S. Waukegan Rd., Ste. A8, #208
Lake Forest, IL 60045
(847) 447-6050
smarek@marek-law.com

Jamie S. Franklin, ARDC No. 6242916
THE FRANKLIN LAW FIRM LLC
53 W. Jackson Blvd., Ste. 803
Chicago, IL 60604
(312) 662-1008
jsf@thefranklinlawfirm.com

***Counsel for Relator Elizabeth Zellner***